## NORTHERN PACIFIC TERMINAL CO. OF OREGON v. CITY OF PORTLAND et al.*
### No. 7726.

Circuit Court of Appeals, Ninth Circuit.
Dec. 6, 1935.

*Certiorari denied 56 S. Ct. 591, 80 L. Ed, ——.

John F. Reilly and James G. Wilson, both of Portland, Or., for appellant.

Frank S. Grant, City Atty. and L. E. Latourette, Deputy City Atty., both of Portland, Or., for appellee.

Before WILBUR, DENMAN, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

Complainant appeals from a decree rendered against it in a suit wherein the relief asked was for an injunction restraining defendants from selling complainant's property under a lien, arising from a special assessment which was levied for the purpose of obtaining revenue to defray the cost of the construction of an improvement known as the "Front Street Intercepting Sewer and Drainage System," in the city of Portland, Or.

The Willamette river runs through the city of Portland, separating the city into what is called the "East Side" and the "West Side." The business district on the west side of the river extends westerly from the river bank, a distance of several blocks. It appears that prior to the construction of the intercepting sewer involved herein, appellant, which operates a railroad terminal in Portland, built the necessary terminal facilities, including a union station, upon a filled in lake bed. There was a high strip of ground between the lake and the river. Appellant filled in the lake bed, principally with sand and gravel taken from the river, up to an elevation of 32 feet; the work being completed about the year 1893. The water in the fill of the lake bed and which is under appellant's property is unaffected by the rise and fall of the water in the river; the reason for which was alleged to be, that the bowl of the lake surrounding appellant's property was of some impervious formation, through which the water in the river cannot percolate. The total investment of the terminal yard approximates $10,000,-000, which does not include another portion of the terminal facilities known as Guild's Lake Yards, where improvements were made in 1922 costing in excess of $1,500,000, and although this latter property does not enter the present controversy, it is a part of the terminal facilities. The union station alone was reconstructed a short time prior to the trial of this cause, at a cost of about $250,000. As the terminal facilities were being constructed, complainant installed its own private sewer system, which has been adequate for its purposes for about 40 years. This sewer emptied into the river at one place only; being about five blocks north from the southern boundary of appellant's property.

The buildings constructed by appellant on its property were constructed so that no provision was made for basements, and no basements have been built thereon. Its sewer system is not of sufficient depth for basement drainage, if basements were constructed on appellant's property. The water in the fill of the lake bed stands so high that a part of it would have to be drained, if basements were built on appellant's property.

The evidence shows the condition along the west side of the river to be in accordance with the following finding of the special master: "For more than a half century prior to 1929 the West Side water front in Portland was an open cess-pool of sewage and filth, and a breeding place for rats and vermin. As the population of the West side increased and additional and larger sewers were constructed the condition became worse, and was accentuated by antiquated buildings and decaying wooden wharfs along the West side river front. In times of high water in the Willamette River, sewers were clogged, downtown basements were flooded and vermin were driven uptown. In the district * * * there was almost an annual interruption to traffic and business caused by the installation of numerous separate pumping plants and the pumping of water and sewage which has seeped, overflowed or been forced into basements into the streets. This situation became a serious menace to the public health, and also a detriment to the property in the affected district by reason of the interruption of business and street traffic and the expense of pumping flood water and sewage from basements. Some business firms had moved away from

the district to other parts of the city, and a further exodus was feared."

This condition, so described, was due in part to the fact that sewers emptied into the river at 29 different places along the west bank of the river, and, because thereof, sewage collected on said bank. This condition, however, according to the testimony, did not extend past a point on the bank which would be directly opposite the southern boundary of appellant's property.

To remedy those conditions, a plan was evolved known as the "Front Street Intercepting Sewer and Drainage System," wherein it was proposed that a concrete bulkhead wall would be built along the west side of the river extending from a point on the bank, about directly opposite the southern boundary of plaintiff's property, on southerly about 18 or 20 blocks. The plan also contemplated an intercepting sewer to be built, connecting all the above-mentioned sewers which emptied directly into the river, and converging them at one point where one outlet into the river was to be made. The plan also contemplated a pumping plant to be constructed at the one sewer outlet point mentioned, to pump the sewage into the river.

The plans and specifications of the plan or project were adopted by the city council on June 24, 1925, by resolution, which also determined the boundaries of the district said to be specially benefited, provided that the cost of the project would be assessed against those specially and peculiarly benefited, declared its intention of constructing such project, and directed publication of the resolution. The resolution was duly published with a notice of the time within which remonstrances might be filed. Appellant filed a protest within the time allowed, protesting against the assessment of its property. "on the ground that none of the said property of this objector will be specially and peculiarly benefited thereby." On September 2, 1925, the city council adopted an ordinance providing for the "time and manner of constructing" the project and directing advertisement for bids. Immediately thereafter, one of the property owners in the assessment district commenced a suit in the state court to enjoin construction of the project, claiming that the city had no power to construct a pumping plant or the bulkhead wall. In due time, this suit reached the Supreme Court of Oregon,

where it was held that construction of the wall and pumping plant were essential parts of the sewerage system, and therefore the project was within the power of the city. Pioneer Real Estate Co. v. City of Portland, 119 Or. 1, 247 P. 319. This decision is conclusive as to the power of the city to construct the sea wall and pumping as an essential part of the sewage system as well as the creation of a district to be impressed with liens for the purpose of securing money to meet the cost thereof.

The city council suspended action on the project until after the decision of the above case, when a contract for the construction of the improvement was duly made. The work was seasonably completed, and was accepted by the council on June 14, 1929. Thereafter, appellant filed a further protest against the assessment of its property, naming some 17 grounds of protest, which, for the most part, consisted of claims that its property was in nowise benefited, and that the assessment constituted a taking of appellant's property without due process of law. This protest was denied and overruled by the council after consideration on July 3, 1929, and on July 12, 1929, the council passed an ordinance declaring the cost of the system to be $2,638,296.95, assessing the property benefited thereby, including a part of appellant's property, and directing entry of the assessments in the docket of the city liens. The part of appellant's property included within the assessment district was assessed for $93,273.34.

When appellant failed to pay the assessment and the same became delinquent, the city treasurer began the proceedings to sell appellant's property, whereupon the instant suit was instituted to enjoin such sale and to declare the assessment void.

The total cost of the project and the amount of the assessment was $2,703,718.80, which is divided as follows:

| | |
|---|---|
| Wall | $1,781,581.20 |
| Pumping Plant | 303,591.56 |
| Intercepting Sewer | 287,498.50 |
| Special charges and interest | 331,047.54 |

The area of the assessment district is equal to 2179.18 lots of an area of 500 square feet each, which includes part of appellant's property equal to 113⅓ of such lots, or 5.3 per cent. of the total area of the district. The amount assessed against appellant's property was 3.1 per cent. of the total assessment.

In assessing the property within the district, the property was divided into two classes: (1) Property which required sanitary sewerage and drainage only; (2) property which required sanitary sewerage and drainage, and, in addition thereto, also required protection from river overflow and sewage in basements.

It was determined that all lots in the district received the benefit of the first class mentioned, and that the cost of that benefit was the entire cost of the intercepting sewer; one-half the cost of the pumping plant and five per cent. of the cost of the wall. This total was then divided by the number of lots in the district and the quotient was the amount of the assessment against each lot, amounting to $242.42, to which was added a proportional amount of the total interest. From the total cost of the project was subtracted the amount so determined to be the total cost of the benefit to the first class of property mentioned above, which left a sum to be assessed against a portion of the lots which came within the second class, and the assessment of those lots was proportional according to their elevation.

Appellant's property was placed in the second classification stated above.

The master found that the inclusion of appellant's property in the second class above mentioned was an arbitrary action on the part of the city, and that appellant's property received the benefit of sanitary sewerage and drainage, but that the wall did not specially benefit appellant's property; that the wall was a part of the sewer project as to a portion of the district, but not with respect to appellant's property.

The trial court held that the wall and pumping plant "were instrumentalities essential to the object and purpose of the improvement," that appellant failed to overcome the presumption that the assessment was valid by its evidence, and overruled the findings and conclusions of the special master in all particulars inconsistent with its opinion.

■ The evidence clearly shows that the improvement for which the assessment is sought includes the intercepting sewer, the pumping plant, and the wall, and that they are integral parts of such improvement. There is some assumption by defendants that appellant is attempting to separate the improvement into parts, but we do not so construe the language used by appellant.

There need be no argument with respect to the essence of the improvement for the evidence of both parties shows that it consisted of a bulkhead wall, a pumping plant, and an intercepting sewer.

■ The rule of law and the exception thereto, governing the case, are well stated in Branson v. Bush, 251 U.S. 182, 189, 40 S.Ct. 113, 115, 64 L.Ed. 215, as follows:

"Where, in laws creating districts for local improvements and taxation, there is such a legislative declaration as this, as to what lands within the district will be benefited by the improvement, the law with respect to the extent to which such determination may be reviewed by the courts is so well settled, and has so lately been re-examined and restated by this court, that extended discussion of the subject is not justified.

"In Spencer v. Merchant, 125 U.S. 345, 8 S.Ct. 921, 31 L.Ed. 763—a decision often cited and approved—it is decided that if the proposed improvement is one which the state had authority to make and pay for by assessments on property benefited, the Legislature, in the exercise of the taxing power, has authority to determine, by the statute imposing the tax, what lands, which might be benefited by the improvement, are in fact benefited by it; and if it does so, its determination is conclusive upon the owners and the courts, and the owners have no right to be heard on the question whether their lands have been benefited or not.

"The subject was carefully re-examined and the law restated in cases so recent as Phillip Wagner v. Baltimore City (Leser), 239 U.S. 207, 36 S.Ct. 66, 60 L.Ed. 230, and Houck v. Little River Drainage District, 239 U.S. 254, 36 S.Ct. 58, 60 L.Ed. 266, with the result that the rule as we have stated it was approved, with the qualification, which was before implied, that the legislative determination can be assailed under the Fourteenth Amendment only where the legislative action is 'arbitrary, and wholly unwarranted,' 'a flagrant abuse, and by reason of its arbitrary character is confiscation of particular property.' And see Withnell v. Ruecking Construction Co., 249 U.S. 63, 69, 39 S.Ct. 200, 63 L.Ed. 479; Hancock v. Muskogee, 250 U.S. 454, 457, 39 S.Ct. 528, 63 L.Ed. 1081; Embree v. Kansas City Road District, 240 U.S. 242, 250, 36 S.Ct. 317, 60 L.Ed. 624."

■ In considering whether or not the assessment in the instant case is "palpably

arbitrary and a plain abuse," as stated in Myles Salt Co. v. Iberia Drainage Dist., 239 U.S. 478, 481, 36 S.Ct. 204, 60 L.Ed. 392, the following quotations are material. In Norwood v. Baker, 172 U.S. 269, 279, 19 S.Ct. 187, 191, 43 L.Ed. 443, it is said: "In our judgment, the exaction from the owner of private property of the cost of a public improvement in substantial excess of the special benefits accruing to him is, to the extent of such excess, a taking, under the guise of taxation, of private property for public use without compensation. We say 'substantial excess,' because exact equality of taxation is not always attainable; and for that reason the excess of cost over special benefits, unless it be of a material character, ought not to be regarded by a court of equity, when its aid is invoked to restrain the enforcement of a special assessment."

And in Houck v. Little River Drainage District, 239 U.S. 254, 265, 36 S.Ct. 58, 61, 60 L.Ed. 266, it is said: "When local improvements may be deemed to result in special benefits, a further classification may be made and special assessments imposed accordingly; but even in such case there is no requirement of the Federal Constitution that for every payment there must be an equal benefit."

And in Kansas City Southern R. Co. v. Road District, 266 U.S. 379, 386, 45 S.Ct. 136, 139, 69 L.Ed. 335, it is said:

"Only where the legislative determination is palpably arbitrary, and therefore a plain abuse of power, can it be said to offend the due process of law clause of the Fourteenth Amendment. [Citations.] And only where there is manifest and unreasonable discrimination in fixing the benefits which the several parcels will receive can the legislative determination be said to contravene the equal protection clause of that amendment. Kansas City Southern R. Co. v. Road Improvement District No. 6, 256 U.S. 658, 41 S.Ct. 604, 65 L.Ed. 1151; Thomas v. Kansas City Southern R. Co., 261 U.S. 481, 43 S.Ct. 440, 67 L.Ed. 758.

"To justify an assessment of benefits to particular lands it is not essential that the benefits be direct or immediate. Valley Farms Co. v. County of Westchester, supra [261 U.S. 155, 43 S.Ct. 261, 67 L.Ed. 585]. But it is essential that they have a better basis than mere speculation or conjecture. Kansas City Southern R. Co. v. Road Improvement District No. 6, supra. * * *

"The evidence, as before outlined, falls short of showing that the assessment against the railway property was either palpably arbitrary or unreasonably discriminatory. The burden was on the railway companies to overcome the presumption attending the legislative determination, and this they failed to do. * * * True, the amount of benefits which will accrue to the railway property is largely a matter of forecast and estimate; but the same thing is true of the farm lands and town lots, and also of benefit assessments in general. [Citations.] Forecast and estimate, based on a solid premise of fact and experience, are not to be confused with mere speculation and conjecture."

In view of the above quotations, the rule as claimed by appellant is too broadly stated, for it imports that the special benefit received must equal the assessment. The major question before us for determination is whether or not the assessment against appellant's property so materially exceeds the special benefits received by it as to be palpably arbitrary.

It is shown by the evidence that if the improvement had been constructed including the intercepting sewer and pumping plant but without the wall, the system would have functioned until the water in the river reached a height of approximately 28 feet, when the water would have then flowed over the bank at its lowest point. However, the improvement as constructed will function until the water in the river rises to a height of 32 feet, which is also the height of appellant's property. If the water in the river reached the height of 32 feet, it would interfere with the operation of appellant on its property to only a slight degree. However, if the water reached that height the operation of appellant's terminal yard would be seriously interfered with, due to the fact that several other railroads leading into appellant's yards would not be able to reach the yards because of flood conditions at other places.

It also appears that the improvement removed a menace to public health by removing the filthy condition along the water front and preventing flooding of basements with backwater and sewage. In so far as appellant's property was concerned, however, it was not affected by these condi-

tions. It does appear that the improvement is capable of being used by appellant and that appellant could receive special benefits, in that the system would permit increased surface drainage, would permit sewage disposal, basement drainage in the event basements were built on appellant's property, and that by reason of these benefits, the value of appellant's property was increased by the improvement so that the assessment did not materially exceed the benefits conferred. These three benefits are the only benefits which we can say are fairly reflected by the evidence.

Defendant contends that where, as in this case, property is assessed which is owned in fee, the assessment must be made against the land itself and not against the use to which the property is permanently devoted. Louisville & N. R. Co. v. Barber Asphalt Co., 197 U.S. 430, 25 S.Ct. 466, 49 L.Ed. 819; Wabash R. Co. v. City of St. Louis (C.C.A. 8) 64 F.(2d) 921; Carolina & N. W. R. Co. v. Town of Clover (C.C.A. 4) 46 F.(2d) 395.

In City of San Diego v. Atchison, Topeka & Santa Fe Ry. Co. (C.C.A.) 45 F.(2d) 11, 13, certiorari denied 283 U.S. 830, 51 S.Ct. 364, 75 L.Ed. 1443, this court said: "Not only is appellee's property now devoted exclusively to railroad purposes, and so improved as to make wholly probable the permanency of such use, but by the deeds conveying title to its immediate predecessor in interest it was expressly provided that the grantee must construct and maintain thereon a passenger station, with reversion of title in case of failure to comply with this condition. We are, therefore, of the opinion that in making the assessment appellant was bound to assume the measurable permanency of such use and to make assessment accordingly."

The use of the property assessed in this case is devoted to railroad purposes. Therefore, if the improvement in this case confers no benefits on the property assessed, as contended by appellant, then in accordance with the general rules set out above, and Myles Salt Co. v. Board of Commissioners, 239 U.S. 478, 36 S.Ct. 204, 60 L.Ed. 392, the assessment made is void.

With respect to the first benefit mentioned above, i. e., increased surface drainage, it does not appear from the evidence that this is a benefit to appellant's property in its use for railroad purposes, for the reason that the surface water has not in 40 years hindered the operation of the property in the slightest degree. One reason for this is because the surface water percolates readily through the sandfill in the lake bed.

Appellant contends that the second benefit, that the improvement would permit sewage disposal, is no "benefit" because its private sewer system is adequate for its needs. In the first place, it is apparent that sewage disposal is a benefit to property used for railroad purposes, especially where, as here, a union station is on the property. The mere fact that appellant had constructed a sewer does not mean that it received no benefit from the city system. In Mayor, etc., of City of Atchison v. Price, 45 Kan. 296, 25 P. 605, 611, it is said: "Some of the defendants in error had constructed private sewers or drains at their own expense, and they now claim that they should not be taxed for the sewer built by the city. While one of these drains was quite expensive, it is not found or stated that any of them were authorized or adopted by the city as a part of the sewer system, nor that they are suitable or adequate for the purposes intended. The legislature has conferred upon the city authorities the discretion and power to provide sewerage facilities, and for that purpose has given them control of the streets and alleys where the sewers are built. They are to determine the necessity for sewers, as well as the character and capacity of those that are required to be built. To allow property owners to decide for themselves whether their lots needed sewerage facilities, or to permit them to provide private ditches, drains, sewers, or cess-pools as they might determine to be sufficient, would be wholly impracticable, and would prevent the adoption of a general sewerage system under the control of the city, as the statutes evidently contemplate."

See, also, Philadelphia v. Odd Fellows Hall, 168 Pa. 105, 31 A. 917; City of St. Joseph v. Owen, 110 Mo. 445, 19 S.W. 713.

It is contended by appellant that there are no basements on the property assessed, that there never have been any basements, and that the union station building is constructed so that no basements could be built thereunder. It is true that, as the property is used now, basement drainage would be no benefit to the property, but it may be that appellant will construct an office building, or a new station, or some

other building, in which a basement might be placed, and, if so, appellant will utilize this benefit. Basement drainage is conceivably a benefit to property used for railroad purposes, and the benefit remains there, whether it is used by appellants or not.

Other property owners in the assessment district obtained other benefits from the improvement, such as preventing overflow of the river on their property. It is unnecessary to consider them, for the evidence clearly shows that appellant received no such benefits.

■ Having established that sewage disposal and basement drainage are special benefits to the property in its use for railroad purposes, and in accordance with the rule stated in Kansas City Southern R. Co. v. Road District, supra, the presumption is that the assessment is not arbitrary, and is valid. It might be argued that it makes no difference to appellant whether the property is valuable or worthless, except for its use, because if its operation could be carried on there, that fact is the only one of importance to it. On the other hand, it is not inconceivable that appellant might sell the entire property to another railroad, and, if so, the value of the property would be an important factor in determining the sale price. Again we are unable to say that it is impossible for some other use to be made of the property which would make a market for the property at a figure greatly in excess of the entire cost to appellant of all its improvements. It is not inconceivable that appellant might at some later date wish to sell the property and build its facilities in some other location in the city. Under these circumstances, we are unable to say that the increased value to the property in its use for railroad purposes is no benefit to appellant.

■ From the foregoing it appears that sewage disposal and basement drainage are, in fact, special benefits accruing to appellant, and that as the assessment does not materially exceed the presumptive value arising therefrom, it is necessary to determine whether or not appellant has overcome such presumption.

■ Appellant introduced evidence to show that sewage disposal and basement drainage could have been as satisfactorily supplied to it by the construction of a pumping plant at the outlet of the main trunk sewer, as it is by the improvement. The proportionate share of the cost of such plant which would be borne by appellant would be $9,400, not including any item in the total cost of the plant for right of way which in the witnesses' opinion would not be required.

However, the finding of the special master in regard to this contention is: " * * * A municipal system constructed so as to flow directly to the river, independently of the intercepter sewer or the Tanner Creek sewer system, would serve plaintiff's property, but whether such a system would be cheaper or better is a matter of opinion and judgment, and the exercise of its powers and discretion in that respect by the city council forecloses the question * * *"

Inasmuch as the evidence is conflicting as to what the cost might be for appellant to obtain these special benefits, we are unable to say that appellant has overcome the presumption that the assessment in question is valid.

It is unnecessary to consider the further point made by defendants that appellants are estopped to bring this suit.

Affirmed.