## PACIFIC GAS & ELECTRIC CO. v. SACRAMENTO MUNICIPAL UTILITY DIST. et al.

### No. 8500.

Circuit Court of Appeals, Ninth Circuit.
Sept. 10, 1937.

Thomas J. Straub, Warren Olney, Jr., J. M. Mannon, Jr., John T. Pigott, and James D. Adams, all of San Francisco, Cal. (McCutchen, Olney, Mannon & Greene, of San Francisco, Cal., of counsel), for appellant.

Robert L. Shinn, Stephen W. Downey, Downey, Brand & Seymour, and Marshall K. Taylor, all of Sacramento, Cal., for appellees.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is an action in equity brought by the plaintiff utility company to enjoin the defendant municipal utility district from issuing proposed bonds to finance the construction and operation of a light, power, and heat system to serve the district.

The gravamen of the complaint is that the bonds will be a charge and lien upon property in the district, including that belonging to plaintiff; that, unless restrained, the defendant will levy taxes upon plaintiff's property to meet the district's obligations under the bonds; that plaintiff's property will receive no benefit by reason of the proposed construction of the district system, and is afforded no opportunity to present the question of benefit to the district or its officers, and hence to tax it without a hearing on the question of benefit is a taking of property without due process of law.

The district is not coterminous with any county or municipality. Its 650 square miles include the city of Sacramento, a large part of the county of Sacramento, and a small portion of Placer county. It was organized under the act of May 23, 1921, Cal.Stats.1921, p. 245, with amend-

ments thereto. Gen.Laws 1931 and Supps. 1933, 1935, Act 6393.

This act provides that a municipal utility district may be organized out of two or more municipalities or out of a municipality and unincorporated territory, by means of resolution and election procedure, which is not necessary to detail here because it is not questioned that the defendant was duly organized and operating. A board of directors, duly elected, is the governing body.

The district is given power to sue and be sued, adopt a seal, take for its purposes property by all lawful means, including eminent domain, and "to acquire, construct, own, operate, control or use, * * * works or parts of works for supplying the inhabitants of said district and municipalities therein, with light, water, power, heat, transportation, telephone service, or other means of communication, or means for the disposition of garbage, sewage, or refuse matter." Section 12, subdivision 5 of the act, supra.

For the execution of its purposes, and upon a vote of two-thirds of its members, a district is authorized to issue bonds to raise funds for carrying out its objects. Section 15.

The district is given authority "to levy and collect, or cause to be levied and collected, taxes for the purpose of carrying on the operations and paying the obligations of the district." Section 12, subd. 9 Gen.Laws Supp.1935, p. 1626.

The complaint recites that the board of directors of the defendant district, pursuant to a general election held November, 1934, duly passed a resolution authorizing the issuance of bonds in the amount of $12,000,000 for the purpose of acquiring and constructing a district light, heat, and power system; also authorizing the levy of taxes which at any time should be required to meet the obligations of the bonds; that, unless restrained, the board will levy on all property within the district on the basis of the county assessments of the counties included.

The formal validity of the bond issue was sustained in an action brought by the district for that purpose. Sacramento M. U. Dist. v. All Parties, 6 Cal.(2d) 197, 203, 57 P.(2d) 506. In that action the Pacific Gas & Electric Company appeared and alleged the invalidity of the bonds on the ground that the taxes to be levied to meet the obligations would deprive it of property unlawfully. The Supreme Court held that the issue was premature, and did not decide it. Id., 6 Cal.(2d) 197, at page 203, 57 P.(2d) 506.

After the bonds in suit here were authorized, the California Legislature passed an act validating the organization, boundaries, board members, and proceedings for the issuance of bonds theretofore completed of all existing districts, and specifically repealed the authorization to levy and collect taxes to meet the obligations of the bonds. Cal.Stats.1937, c. 20.

The defendant district moved to dismiss the bill upon several grounds. The District Court held that a controversy was properly presented, and ruled in favor of appellant on all grounds of dismissal save the question of the merits. On this it concluded that the proposed bond issue and the taxes proposed to be levied pursuant to it were valid and did not operate to deprive plaintiff of its property without due process of law.

The parties are agreed that this is the only question presented before this court. Hence it is unnecessary to consider such issues as prematurity, res judicata, adequate remedy at law, etc.

The regularity of all proceedings leading up to and including the bond authorization is admitted not to be in dispute; nor is there presented as an issue the fact that appellant has no opportunity under the proceedings or the Utility District Act to present its contention that its property will not be benefited by the proposed construction and operation of a district utility system.

The Legislature conceives such districts as empowered to perform one or more of several functions, whose benefits are to be available to all human beings in the area who may desire or need their services. This particular district was formed to perform *all* of them, the language being:

"Resolved, further, that said municipal utility District be organized for the purpose of acquiring, constructing, owning, operating, controlling or using within or without or partly within or without the district, works for supplying the inhabitants of said district and the said City of Sacramento, without preference to said City of Sacramento, with *each* and *all* of the utilities permitted by law; that the kind of utilities proposed to be *first* acquired

shall be utilities for furnishing light, heat and power for said district." (Italics supplied.)

■ It is obvious that the general tax is none the less valid because the three functions of providing the public with heat, light, and power are *"first"* in the committed purpose of furnishing all the utilities. The district is not required to spring, like Minerva, full panoplied from its Jovian head, the state of California. It cannot be an unconstitutional tax prior to the time the district has acquired all the proposed utilities and then, when functioning in all, become constitutional because of the more comprehensive service of public human needs which the tax supports.

Nor can it be denied that one of the services, i. e., the disposal of sewage, is a usual governmental function for the preservation of the health of the district's citizens, and one for which no charge is made to the served by the sewers' pumping plant, water flushing, and similar incidents. Historically, the disposition of sewage and its incidents are supported by general taxation.

The appellant admits, that, if any such governmental subdivision as a city or a county, or the state as a whole, imposed an ad valorem tax upon all property, real or personal, to maintain such a power utility, it would be a valid tax upon appellant's property within the city, county, or state.[1] This admission includes the fact that such a tax would support a rival industry whose competition might destroy appellant's business and from which appellant could receive as much benefit as does an aged and dying bachelor from the tax he pays for the education of school children.[2]

Nor does appellant contend that such general taxation is not permitted the state, counties, or cities for the power plant and water supply or for the maintenance of sewage systems for the protection of the health of all the inhabitants of the city, county, or state; or electric lamps for streets to light the farmer as he passes through; or the providing of the water he drinks from a public tap, or in a hotel or home; or power for the use of the saw of the transient carpenter or a portable mill in the forest, as well as for cooling fans in hotels and public meeting places, in the homes and industrial plants; or telephone service for the use of all persons at public booths; or street or suburban public passenger transportation.

The question then is, Can California create a municipality having the power of general taxation of all the property in its area to support the serving of the public at large with light, water, power, heat, transportation, telephone service, and other means of communication, and means for the disposition of sewage, garbage, and refuse matter?

To this the appellant urges that such a subdivision of the state is not a "government" or an "agency of government" and that only a government or an agency of government can levy a general tax. Appellant's contention is necessarily summarized to be that, only if to these historically more recently utility services rendered to the public, there are added to the district's powers the older functions of legislative and judicial tribunals and general executive administration, can they be supported by general taxation. Viewing the contention a priori, it would be a shocking surprise to the student of governmental theory and history if the Fifth or Fourteenth Amendment so has limited the powers which the Tenth Amendment has reserved to the states.

■ It is our opinion that the Sacramento Municipal Utility District is an agency of government to the extent that it may exercise such power of general taxation. That the service of furnishing light, heat, and power through electrical transmission to the public at large, so universal in rural, suburban, and urban areas of California, has become as interwoven in the lives of California men and women as has the function of supplying them with domestic water, needs no better evidence than is shown in the enterprise of appellant as alleged in its bill of complaint.

■ The substitution, in the stifling summer heat of California's interior valleys, of the electric globe for the hot kerosene lamp, of the electric range for the coal-burning kitchen stove, and the introduction of the electric fan, and, in the frosts of winter, of the portable electric heater, created a new era of human health and comfort. Such in-

---

[1] Puget Sound Power & Light Co. v. Seattle, 291 U.S. 619, 625, 54 S.Ct. 542, 78 L.Ed. 1025.

[2] Brush v. Commissioner, 300 U.S. 352, 373, 57 S.Ct. 495, 81 L.Ed. 691, 108 A. L.R. 1428.

cidents of the electrical age can be multiplied indefinitely. We take judicial notice that the universal use of electric heat, light, and power has become a common necessity in California, comparable to the community supply of water for domestic use. Indeed, the facility of electric transmission may well have made the number of Californians served by it greater than those served by private and public water systems. The farm buildings of today have electric power and light from some source of general supply, while their water usually comes from individual springs or wells, the latter often made available only by electric motor driving the pump.

The Supreme Court of the United States has recently determined that the supplying of such a service to the public at large is a governmental function and supports our conclusion that a municipal district such as the appellee here is an agency of government exercising the state's sovereignty in a governmental function and that to make such exercise of a state's sovereignty it may raise the necessary funds by general taxation. Brush v. Commissioner, 300 U.S. 352, 57 S.Ct. 495, 81 L.Ed. 691.

In Brush v. Commissioner, the Supreme Court held that Congress could not impose a tax upon the income of a chief engineer of the Bureau of Water Supply of the City of New York because "the water system of the city was created and is conducted in the exercise of the city's governmental functions." Id., 300 U.S. 352, at pages 359, 360, 57 S.Ct. 495, 81 L.Ed. 691, 108 A.L.R. 1428. In support of its conclusion the court reviews the need of a water supply for "public schools, public sewers so necessary to preserve health, fire departments, street sprinkling and cleaning, public buildings, parks, playgrounds, and public baths." Id., 300 U.S. 352, at page 370, 57 S.Ct. 495, 500, 81 L.Ed. 691, 108 A.L.R. 1428. It is obvious that electric power and light perform a similar function with regard to schools, sewers, the pressure of water for fire departments, street sprinkling and cleaning, for public buildings, parks, playgrounds, and public baths.

Continuing the description of the character of such a governmental function, the court says:

"Moreover, the health and comfort of the city's population of 7,000,000 souls, and in some degree their very existence, are dependent upon an adequate supply of pure and wholesome water. It may be, as it is suggested, that private corporations would be able and willing to undertake to provide a supply of water for all purposes; but if the state and city of New York be of opinion, as they evidently are, that the service should not be entrusted to private hands, but should be rendered by the city itself as an appropriate means of discharging its duty to protect the health, safety, and lives of its inhabitants, we do not doubt that it may do so in the exercise of its essential governmental functions. ·

"We find nothing that detracts from this view in the fact that in former times the business of furnishing water to urban communities, including New York, in fact was left largely, or even entirely, to private enterprise. The tendency for many years has been in the opposite direction, until now in nearly all the larger cities of the country the duty has been assumed by the municipal authorities. Governmental functions are not to be regarded as nonexistent because they are held in abeyance, or because they lie dormant, for a time. If they be by their nature governmental, they are none the less so because the use of them has had a recent beginning." Brush v. Commissioner, 300 U.S. 352, 371, 57 S.Ct. 495, 500, 81 L.Ed. 691, 108 A.L.R. 1428.

The recognition of the supplying of water to the inhabitants of a political subdivision of the state as a governmental function has recently emerged from what the court in the Brush opinion describes as the "zone of debatable ground within which the cases must be put on one side or the other of the line ·by what this court has called the gradual process of historical and judicial 'inclusion and exclusion.'"

In earlier cases the Supreme Court has drawn a distinction between proprietary and governmental functions and has said, though the Brush Case states it has not so held, that the supplying of water falls within the proprietary as distinguished from the governmental classification. The Brush Case does not purport to overrule two of the court's former opinions, Flint v. Stone Tracy, 220 U.S. 107, 172, 31 S. Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312; South Carolina v. U. S., 199 U.S. 437, 461, 26 S.Ct. 110, 50 L.Ed. 261, 4 Ann.Cas. 737, but states that the classification of the supplying of water there made was unnecessary to the decision of those cases.

California has gone through a similar evolution of governmental concept. Early it was held that the supplying of water by a municipality was a function to be classed as proprietary with reference to torts committed by the employees of the water utility conducted by a city or town, Davoust v. City of Alameda, 149 Cal. 69, 72, 84 P. 760, 5 L.R.A.(N.S.) 536, 9 Ann.Cas. 847; South Pasadena v. Pasadena Land Co., 152 Cal. 579, 593, 93 P. 490, and with reference to torts its Supreme Court maintains this view with regard to such a municipal utility district as the appellee, Morrison v. Smith Bros., 211 Cal. 36, 44, 45, 293 P. 53.

On the other hand, with reference to the power of general taxation of such municipal utility districts, the California Supreme Court has held, first, that it has such power because "it is, in fact, engaging in business upon municipal capital, and for municipal purposes. * * * Any tax, therefore, levied and collected for the purpose of supplying such municipal capital is not a tax or assessment on property *directly benefited* by the construction of some *local improvement,* but is a *general* tax levied just as, and for the same purpose that, any *general municipal* tax is imposed for carrying on the governmental functions and utilitarian objects of duly incorporated cities or towns." (Italics supplied.) In re Orosi Public Utility Dist., 196 Cal. 43, 58, 235 P. 1004, 1010.

Soon after, when the question of power of general taxation to support the utility of such a district again came before the court, it reviewed the prior cases upholding such general taxation and found the same development of governmental theory as recognized in the Brush Case. It says the distinction between "what are governmental and what are proprietary powers to be exercised by public corporations, *in so far as the maintenance of these by general taxation is concerned, is fast fading out of our jurisprudence.*" City of Pasadena v. Chamberlain, 204 Cal. 653, 662, 269 P. 630, 634. (Italics supplied.)

While the California Supreme Court then had not reached the obliteration of all distinction in terminology, it had advanced towards the conclusion reached in the Brush Case to the extent of calling the utility service *"at least* quasi governmental in character."

"Municipal corporations, whether organized under special charters or general laws, derive these particular powers from the same legal sources as those which provide for the organization of quasi municipal corporations such as that provided for in this act, and we can perceive no real distinction between the organization of a municipal corporation, strictly so-called, for the carrying forth of the purposes usually committed to such governmental agencies and the organization under legislative sanction of such other governmental agencies as municipal water districts or public utility districts or metropolitan water districts, which, while these may not exercise all of the functions committed to municipal corporations, strictly so-called, *are empowered to exercise certain of these functions which have come to be recognized as at least quasi governmental in character.* Nor can we perceive any substantial reason why such district when so organized may not be invested with the same powers in the matter of the levying and collection of taxes for the carrying forth of its limited purposes with which municipal corporations are invested for the carrying forth of similar, though more diversified purposes." (Italics supplied.) City of Pasadena v. Chamberlain, 204 Cal. 653, 663, 664, 269 P. 630, 634.

With the United States Supreme Court in the Brush Case holding that the furnishing of such utilities as the supplying of water to the general public is "by their nature governmental," and that "they are none the less so because the use of them has had a recent beginning," and the state of California holding that such a municipal utility district exercises a function which is "at least quasi-governmental in character" and that it may be supported by general taxation, we cannot agree with appellant's contention that the district is not an "agency of government" empowered to support the utility by a general tax.

While we are of the opinion that the furnishing of the utilities of light, heat, and power are "by their nature governmental" and that "they are none the less so because the use of them has had a recent beginning," we would be constrained to reach the same conclusion were the question in what the Brush opinion describes as "the zone of debatable ground."

■ The Supreme Court has repeatedly held that in determining the constitutionality of a state or federal law we are required to consider the rationally conceivable

facts attributable to the deliberation, belief and purpose of the Legislature in its enactment. This is the rule stated as controlling the consideration of a bankruptcy act of the state of New York, in the opinion of Mr. Justice Bushrod Washington, in Ogden v. Saunders, 12 Wheat. 213, 269, 270, 6 L.Ed. 606: "It is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body, by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond all reasonable doubt."

Again the rule was stated in the Sinking-Fund Cases (Union P. R. Co. v. U. S.), 99 U.S. 700, 718, 25 L.Ed. 496, to be: "It is our duty, when required in the regular course of judicial proceedings, to declare an act of Congress void if not within the legislative power of the United States; but this declaration should never be made except in a clear case. Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown *beyond a rational doubt.* One branch of the government [the judiciary] cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a *strict observance of this salutary rule.*" (Italics supplied.)

Again it was stated in determining the constitutionality of a New York statute in Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369, Ann.Cas.1912C, 160: "if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed." O'Gorman & Young v. Hartford Fire Ins. Co., 282 U.S. 251, 257, 51 S.Ct. 130, 75 L.Ed. 324, 72 A.L.R. 1163; Williams v. Mayor, 289 U.S. 36, 42, 53 S.Ct. 431, 77 L.Ed. 1015; U. S. v. Butler, 297 U.S. 1, 67, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914.

■ Hence we are compelled to find that it "reasonably can be conceived" by the California Legislature, when it ratified the formation of the Sacramento Municipal Utility District, that the "health and comfort" of the people of the Sacramento Municipal Utility District "are dependent upon an adequate supply" of electrically transmitted heat, power, and light; nor can we hold that it is an irrational concept that "in some degree their very existence" is dependent upon such power in supplying water and the disposal of sewage. It is also a rational concept that the Legislature had progressed in its views of the governmental quality of these utilities beyond their characterization in the Pasadena Case as "quasi-governmental" to the view of the United States Supreme Court decision in the Brush Case that they are unqualifiedly governmental. Certainly such conclusions can in no sense be among the "fanciful conjectures" (Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 79 L.Ed. 281) sometimes offered to support the constitutionality of statutes.

■ However, entirely aside from the use of particular phraseology, the underlying question is whether the utility serves the public at large and is made available to the inhabitants of the district as a whole, or whether it leads merely to the improvement of certain property within the area of the political subdivision, and gives no benefit whatsoever to other property in the same area sought to be taxed. This distinction is made in a case cited and relied on by the appellant. Illinois Central Railroad v. Decatur, 147 U.S. 190, 197, 198, 199, 13 S.Ct. 293, 294, 37 L.Ed. 132. In that case the court states:

"Taxes proper, or general taxes, proceed upon the theory that the existence of government is a necessity; that it cannot continue without means to pay its expenses; that for those means it has the right to compel all citizens and property within its limits to contribute; and that for such contribution it renders no return of special benefit to any property, but only secures to the citizen that general benefit which results from protection to his person and property, *and the promotion of those various schemes which have for their object the welfare of all.* * * *

"On the other hand, special assessments or special taxes proceed upon the theory that, when a local improvement enhances the value of neighboring property, that property should pay for the improvement. * * * The general levy of taxes is understood to exact contributions in return for the general benefits of government, and it promises nothing to the persons taxed beyond what may be anticipated from an administration of the laws for individual protection and the general public good. Special assessments, on the other hand, are made upon the assumption that a portion

of the community is to be especially and peculiarly benefited, in the enhancement of the value of property peculiarly situated as regards a contemplated expenditure of public funds."

Appellant's contention is that the acquisition of· the electric power plant is not "for the promotion of [one of] those various schemes which have for their object the welfare of all."

While appellant cannot deny that these services are rendered to the public at large, composed of human beings to whom they are made available, what its claim amounts to is that, because they also improve certain other property and do not improve appellant's property, they can be furnished only by a different class of political entity, i. e., an "improvement district," which must confine itself to taxation only upon property proved to be benefited.

The fallacy of appellant's argument lies in its contention that the purpose of the Legislature in creating such municipal utility districts is merely .to enable a district to acquire,.say, a power plant; that a power plant is a mere property improvement, something which in itself is the object for which the area in question is included in the district; and, since the acquisition of such a property does not enhance the value of appellant's property, it cannot be taxed for its acquisition.

·The fallacy is apparent. The municipal district is a political organization of the human beings within its boundaries and is formed for rendering services to be made available to them. Its primary purpose is not to benefit any particular property. What benefit comes to property is an incident to the use and enjoyment of the utilities each person. may take or has ·the opportunity to take. Such human use and enjoyment, the primary purposes, have for their intermediate instruments the power plants and the right to issue bonds and to tax generally, but appellant puts the cart before the horse when it claims the ultimate function of the district is the mere ownership of the property in the plant or the mere right to issue bonds or to tax, and not the general personal betterment of its inhabitants.

The district is an improvement district only in the broader sense of the improvement of the well-being and comfort of its people. It is a misnomer to apply to it the phrase "improvement district" in the sense that phrase is sometimes technically used to describe a district which supplies irrigation for certain lands and excludes lands which cannot come under its flow, Miller & Lux v. Board of Supervisors, 189 Cal. 254, 267, 268, 208 P. 304, or changes the grade or width of streets benefiting the property of a certain area of a city and of no value to other city property distantly located, Meyer v. San Francisco, 150 Cal. 131, 136, 88 P. 722, 10 L.R.A. (N.S.) 110.

Whatever may have been the principle controlling the earlier cases, the United States Supreme Court in another recent case has held that as to road building it is within the power of a state to create a road district as a continuing political entity having the power to levy general taxes for their construction and maintenance. Memphis & Charleston Ry. v. Pace, 282 U. S. 241, 245, 51 S.Ct. 108, 75 L.Ed. 315, 72 A.L.R. 1096.

Regardless of whether the Pace Case overruled Browning v. Hooper, 269 U.S. 396, 46 S.Ct. 141, 70 L.Ed. 330, principally relied on by appellant, it is clearly distinguishable. In the Browning Case the district was organized for the sole purpose of constructing a single road. It had no continuing functions. There was, in the . Browning Case, no validation by the state Legislature of the creation of the district, the selecting of boundaries, or the issuance of bonds. In the Pace Case, as with the appellee utility district, the district was a continuing political entity, authorized under a general enactment and its existence and legality ratified by special statute.

Plaintiff also cites Oregon Short Line R. Co. v. Clark County Highway District (D.C.Idaho) 17 F.(2d) 125, which, relying upon Browning v. Hooper, supra, laid down a similar rule with respect to a road district in Idaho. This case can be no more persuasive than the Browning decision.

Plaintiff cites no other cases which persuade us to a view different from the one we have taken. It does not deny the rule of Puget Sound Power & Light Co. v. Seattle, 291 U.S. 619, 625, 54 S.Ct. 542, 78 L.Ed. 1025, to the effect that the furnishing of electric power and light is a public function for the support of which a private company may constitutionally be taxed, though the public utility's competition may destroy the private competitor. The Seattle Case follows Green v. Frazier,

253 U.S. 233, 40 S.Ct. 499, 64 L.Ed. 878, wherein it was held that (1) banking, (2) mill and elevator service, and (3) home building were functions which the state might perform and for the support of which it might levy general taxes. Each of these functions involves a charge to the consumers for the services rendered.

In each general taxation starts the initial financing and meets the deficit, if any, between maintenance cost and receipts. In each the public utility's competition may occasion loss to the private competitor. Such taxation and competition are held not violative of the Fifth or Fourteenth Amendment. They are no more so when occurring in one form of political subdivision of the state than in another.

"It is undoubtedly a question of local policy with each state what shall be the extent and character of the powers which its various political and municipal organizations shall possess; and the settled decisions of its highest courts on this subject will be regarded as authoritative by the courts of the United States; for it is a question that relates to the internal constitution of the body politic of the state. But as all, or nearly all, the states of the Union are subdivided into political districts similar to those of the country from which our laws and institutions are in great part derived, having the same general purposes and powers of local government and administration, we feel authorized, in the absence of local state statutes or decisions to the contrary, to interpret their general powers, in accordance with the analogy furnished by their common prototypes, varied and modified, of course, by the changed conditions and circumstances which arise from our peculiar form of government, our social state, and physical surroundings." Claiborne County v. Brooks, 111 U.S. 400, 410, 4 S.Ct. 489, 494, 28 L.Ed. 470.

Aside from Browning v. Hooper, supra, plaintiff calls to our attention only one case which holds that a subdivision of the state, organized to perform a certain function or functions, cannot finance the same by general taxes. This is Myles Salt Co. v. Iberia Drainage District, 239 U.S. 478, 485, 36 S.Ct. 204, 60 L.Ed. 392. There a district was formed to drain the lands within the district's boundaries, most of which were marshy. It was held that the owner of high land which did not need and could not benefit from drainage could not be taxed for that purpose.

The case is readily distinguishable from the one at bar. The draining of lands is a function which directly benefits real property. Any benefit to individuals comes from the enhanced value of the real estate. Electricity is, as we have pointed out, a service to the public generally.

What is true of drainage districts is also, arguably, true of irrigation districts. The primary benefit is to the land. This serves to distinguish irrigation districts from the case before us, although there are remarks in Fallbrook Irr. Dist. v. Bradley, 164 U.S. 112, 164, 17 S.Ct. 56, 41 L.Ed. 369, and Roberts v. Richland Irrigation Dist., 289 U.S. 71, 74, 75, 53 S.Ct. 519, 77 L.Ed. 1038, which indicate that irrigation may be a public function for which a public corporation may tax generally if it wishes.

The remainder of plaintiff's cases are valueless. They all present the situation where the state or a subdivision of the state has undertaken to finance one of its functions by creating special improvement areas and assessing the cost against property specially benefited. That a state may constitutionally do this, and in numerous cases has done so, is no argument against the state's power to finance a service to the public at large by general taxation if it chooses to do so. Georgia Ry. & Elec. Co. v. Decatur, 295 U.S. 165, 170, 55 S.Ct. 701, 79 L.Ed. 1365; Roberts v. Richland Irr. Dist., supra; Fallbrook Irr. Dist. v. Bradley, supra; Nashville, C. & St. L. Ry. v. Walters, 294 U.S. 405, 430, 55 S.Ct. 486, 79 L.Ed. 949; Gast Realty Co. v. Schneider Granite Co., 240 U.S. 55, 59, 36 S.Ct. 254, 60 L.Ed. 523; City of San Diego v. Atchison, Topeka & Santa Fe R. Co. (C.C.A.9) 45 F.(2d) 11; Northern Pacific Terminal Co. v. Portland (C.C.A.9) 80 F.(2d) 738, 740.

■ We hold, therefore, that the Sacramento Municipal Utility District is a validly constituted political subdivision of the state of California, duly empowered to finance the public function of supplying its inhabitants with light, heat, and power through general taxation; and that such taxation, levied without a hearing on the question of benefits, deprives appellant of none of its constitutional rights.

Affirmed.