[S.F. No. 22787. In Bank. Apr. 26, 1971.]

ASSOCIATED HOME BUILDERS OF THE GREATER EAST BAY,
INCORPORATED, Plaintiff and Appellant, v.
CITY OF WALNUT CREEK et al., Defendants and Respondents.

## Counsel

Ring, Turner & Ring and Harold H. Turner for Plaintiff and Appellant.

Daniel J. Curtin, Jr., City Attorney, for Defendants and Respondents.

Evelle J. Younger, Attorney General, Sanford N. Gruskin, Assistant Attorney General, Denis D. Smaage, Deputy Attorney General, William A. Hirst, City Attorney (Pleasanton), John A. Lewis, City Attorney (Livermore), Miller, Groezinger, Pettit & Evers and Robert A. Thompson as Amici Curiae on behalf of Defendants and Respondents.

## Opinion

**MOSK, J.**—Section 11546 of the Business and Professions Code authorizes the governing body of a city or county to require that a subdivider must, as a condition to the approval of a subdivision map, dedicate land or pay fees in lieu thereof for park or recreational purposes. In this class action for declaratory and injunctive relief, Associated Home Builders of the Greater East Bay, Incorporated (hereinafter called Associated)[1] challenges the constitutionality of section 11546 as well as legislation passed by the City of Walnut Creek to implement the section. It is also asserted that the city's enactments do not comply with the requirements set forth in the section. The trial court found in favor of the city, and Associated appeals from the ensuing judgment.

Section 11546 of the Business and Professions Code provides:

"The governing body of a city or county may by ordinance require the dedication of land, the payment of fees in lieu thereof, or a combination of both, for park or recreational purposes as a condition to the approval of a final subdivision map, provided that:

---

[1]Associated is a nonprofit corporation organized for the purpose of promoting the home building industry. Some of the members own Walnut Creek land which they intend to subdivide into four or more lots under the Subdivision Map Act. (Bus. & Prof. Code, § 11500 et seq.)

"(a) The ordinance has been in effect for a period of 30 days prior to the filing of the tentative map of the subdivision.

"(b) The ordinance includes definite standards for determining the proportion of a subdivision to be dedicated and the amount of any fee to be paid in lieu thereof.

"(c) The land, fees, or combination thereof are to be used only for the purpose of providing park or recreational facilities to serve the subdivision.

"(d) The legislative body has adopted a general plan containing a recreational element, and the park and recreation facilities are in accordance with definite principles and standards contained therein.

"(e) The amount and location of land to be dedicated or the fees to be paid shall bear a reasonable relationship to the use of the park and recreational facilities by the future inhabitants of the subdivision.

"(f) The city or county must specify when development of the park or recreational facilities will begin.

"(g) Only the payment of fees may be required in subdivisions containing fifty (50) parcels or less.

"The provisions of this section do not apply to industrial subdivisions."

Section 10-1.516 of the Walnut Creek Municipal Code, which will be discussed *infra,* refers to a general park and recreational plan adopted by the city. It provides that if a park or recreational facility indicated on the general plan falls within a proposed subdivision the land must be dedicated for park use by the subdivider in a ratio (set forth in a resolution) determined by the type of residence built and the number of future occupants. Pursuant to the ratio, two and one-half acres of park or recreation land must be provided for each 1,000 new residents. If, however, no park is designated on the master plan and the subdivision is within three-fourths of a mile radius of a park or a proposed park,[2] or the dedication of land is not feasible, the subdivider must pay a fee equal to the value of the land which he would have been required to dedicate under the formula.[3]

---

[2]Associated contends that the city is not limited in expending the in-lieu fee to purchase or improve a park within three-fourths of a mile radius from the subdivision which provides the fee. However, the ordinance so provides. The city's standard for a long-range park plan does indicate that a community park (which serves a larger area than a neighborhood park) should be within a radius of one and a half miles from the homes served. But this is a general standard for all residences, and has no reference to the expenditures of fees provided by subdividers in lieu of dedication. As to the latter subject, section 10-1.516 governs.

[3]The requirement of dedication is qualified as to subdivisions containing 50 parcels or less. In order to comply with subdivision (g) of section 11546 only the payment of fees may be required in subdivisions of such size.

Section 11546 and the city's ordinance are designed to maintain and preserve open space for the recreational use of the residents of new subdivisions. The adoption of a general plan (subd. (d)) avoids the pitfall of compelling exactions from subdividers of land which may be inadequate in size or unsuitable in location or topography for the facilities necessary to serve the new residents. Under the legislative scheme, the park must be in sufficient proximity to the subdivision which contributes land to serve the future residents. Thus subdividers, providing land or its monetary equivalent, afford the means for the community to acquire a parcel of sufficient size and appropriate character, located near each subdivision which makes a contribution, to serve the general recreational needs of the new residents.

If a subdivision does not contain land designated on the master plan as a recreation area, the subdivider pays a fee which is to be used for providing park or recreational facilities to serve the subdivision. One purpose of requiring payment of a fee in lieu of dedication is to avoid penalizing the subdivider who owns land containing an area designated as park land on the master plan. It would, of course, be patently unfair and perhaps discriminatory to require such a property owner to dedicate land, while exacting no contribution from a subdivider in precisely the same position except for the fortuitous circumstance that his land does not contain an area which has been designated as park land on the plan.

### Constitutionality of Section 11546

Associated's primary contention is that section 11546 violates the equal protection and due process clauses of the federal and state Constitutions in that it deprives a subdivider of his property without just compensation. It is asserted that the state is avoiding the obligation of compensation by the device of requiring the subdivider to dedicate land or pay a fee for park or recreational purposes, that such contributions are used to pay for public facilities enjoyed by all citizens of the city and only incidentally by subdivision residents, and that all taxpayers should share in the cost of these public facilities. Thus, it is asserted, the future residents of the subdivision, who will ultimately bear the burden imposed on the subdivider, will be required to pay for recreational facilities the need for which stems not from the development of any one subdivision but from the needs of the community as a whole.

In order to avoid these constitutional pitfalls, claims Associated, a dedication requirement is justified only if it can be shown that the need for additional park and recreational facilities is attributable to the increase in population stimulated by the new subdivision alone, and the validity of the

section may not be upheld upon the theory that all subdivisions to be built in the future will create the need for such facilities.

In *Ayres* v. *City Council of Los Angeles* (1949) 34 Cal.2d 31 [207 P.2d 1], we rejected similar arguments. In that case, a city imposed upon a subdivider certain conditions for the development of a residential tract, including a requirement that he dedicate a strip of land abutting a major thoroughfare bordering one side of the subdivision but from which there was no access into the subdivision. The subdivider insisted that he could be compelled to dedicate land only for streets within the subdivision to expedite the traffic flow therein and that no dedication could be required for additions to existing streets and highways. Moreover, he asserted, the city had been contemplating condemning the property for the purposes indicated in any event, the benefit to the lot owners in the tract would be relatively small compared to the benefit to the city at large, and the dedication requirement amounted, therefore, to the exercise of the power of eminent domain under the guise of subdivision map proceedings.

We held that the city was not acting in eminent domain but, rather, that a subdivider who was seeking to acquire the advantages of subdivision had the duty to comply with reasonable conditions for dedication so as to conform to the welfare of the lot owners and the general public. We held, further, that the conditions were not improper because their fulfillment would incidentally benefit the city as a whole or because future as well as immediate needs were taken into consideration and that potential as well as present population factors affecting the neighborhood could be considered in formulating the conditions imposed upon the subdivider. We do not find in *Ayres* support for the principle urged by Associated that a dedication requirement may be upheld only if the particular subdivision creates the need for dedication.

Even if it were not for the authority of *Ayers* we would have no doubt that section 11546 can be justified on the basis of a general public need for recreational facilities caused by present and future subdivisions. The elimination of open space in California is a melancholy aspect of the unprecedented population increase which has characterized our state in the last few decades. Manifestly governmental entities have the responsibility to provide park and recreation land to accommodate this human expansion despite the inexorable decrease of open space available to fulfill such need. These factors have been recognized by the recent adoption of article XXVIII of the Constitution, which provides that it is in the best interests of the state to maintain and preserve open space lands to assure the enjoyment of natural resources and scenic beauty for the economic and social well-being of the state and its citizens. Statutes which further the under-

lying policy expressed in the constitutional section must be upheld whenever possible in order to effectuate its salutary purposes.

The legislative committee which recommended the enactment of section 11546 emphasized that land pressure due to increasing population has intensified the need for open space, that parks are essential for a full community life, and that local officials have been besieged by demands for more park space. (21 Assembly Interim Com. Report, Municipal and County Government (1963-1965) pp. 33-34.) The urgency of the problem in California is vividly described in other portions of the report set forth in the margin.[4]

These problems are not confined to contemporary California. It has been estimated that by the year 2000 the metropolitan population of the United States will increase by 110 to 145 million, that 57 to 75 million of the increase will occur in areas which are now unincorporated open land encircling metropolitan centers, and that the demand for outdoor recreation will increase tenfold over the 1956 requirement. (See Zilavy, *Comment,* 1961 Wis.L.Rev. 310, fns. 1 and 2.) Walnut Creek is a typical growth community. Located minutes' distance by motor vehicle from the metropolitan environs of Oakland and East Bay communities, the city population rose from 9,903 in 1960 to 36,606 in 1970, an increase of more than 365 percent in a decade.

■ We see no persuasive reason in the face of these urgent needs caused by present and anticipated future population growth on the one hand and the disappearance of open land on the other to hold that a statute re-

---

[4]The report states, "Concern is being expressed statewide in California that we may be in danger of '. . . building ourselves into a cement-lumber jungle.' Land pressures have been building steadily and the rising market price of each available scrap of urban land has made land the focus of competitive interests and . . . values. Recreation experts, planning commissions and conservationists have long insisted that the provision of recreation areas in subdivisions is a necessity. They argue that healthful, productive community life depends in part on the availability of recreation and park space.

"Population congestion magnifies the need for urban open space. It is perhaps the visual impact of thousands upon thousands of houses built row on row without relief of open space which has been most responsible for stimulating burgeoning citizen interest in the problem of providing for recreation areas in subdivision developments. . . .

"Neighborhood parks are a necessary component of community life. The committee has not encountered one local official who would deny the value of the neighborhood park. Elected officials, particularly, have found themselves besieged by demands for more park space. Families who have moved to suburbia in the hope of finding escape from urban congestion have found instead that their children may there too be forced into the streets in their natural pursuit of recreation space. These people turn to the community as a whole for aid in providing the desired parks." (Fns. omitted.) (Assembly Interim Com. on Municipal and County Government, *op. cit. supra,* pp. 33-34.)

quiring the dedication of land by a subdivider may be justified only upon the ground that the particular subdivider upon whom an exaction has been imposed will, solely by the development of his subdivision, increase the need for recreational facilities to such an extent that additional land for such facilities will be required.

Associated next contends that even if it be conceded that no showing of a direct relationship between a particular subdivision and an increase in the community's recreational needs is required, nevertheless the subdivider cannot be compelled to dedicate lands for such needs, or pay a fee, unless his contribution will necessarily and primarily benefit the particular subdivision. Whether or not such a direct connection is required by constitutional considerations, section 11546 provides the nexus which concerns Associated. The act requires that the land dedicated or the fees paid are to be used only for the purpose of providing park or recreational facilities to serve the subdivision (subd. (c))[5] and (subd. (e)) that the amount and location of land or fees shall bear a reasonable relationship to the use of the facilities by the future inhabitants of the subdivision.[6]

---

[5]We do not deem subdivision (c) to mean that the facilities purchased with a particular contribution may only be used by the residents of the subdivision which made the contribution; rather, that the fees may not be diverted to any purpose other than for park or recreational facilities which will be available for use by those residents. Clearly, the constitutionality of the exaction is not dependent upon exclusive use of the facilities by those who will occupy the subdivision. *Ayres* teaches that the fact the public will also benefit from the use made of the land dedicated is not a ground for holding an exaction invalid.

[6]Amicus curiae Sierra Club urges that the requirement of dedication or the payment of a fee may be justified under the state's police power even if the recreational facilities provided by the subdivider's contribution are not used for the specific benefit of the future residents of the subdivision but are employed for facilities used by the general public. Ordinarily if land within the subdivision is dedicated for a park it may be assumed that those who will reside in the subdivision will make primary use of the park. The problem of connecting the facilities with the use made of them by the subdivision residents arises when a fee in lieu of dedication is required. In view of the provisions of section 11546, we need not decide in the present case whether a subdivider may be compelled to make a contribution to a park which is, for example, not conveniently located to the subdivision. Parenthetically, however, we perceive merit in the position of amicus curiae. It is difficult to see why, in the light of the need for recreational facilities described above and the increasing mobility of our population, a subdivider's fee in lieu of dedication may not be used to purchase or develop land some distance from the subdivision but which would also be available for use by subdivision residents. If, for example, the governing body of a city has determined as has the city in the present case, that a specific amount of park land is required for a stated number of inhabitants, if this determination is reasonable, and there is a park already developed close to the subdivision to meet the needs of its residents, it seems reasonable to employ the fee to purchase land in another area of the city for park purposes to maintain the proper balance between the number of persons in the community and the amount of park land available. The subdivider who deliberately or fortuitously develops land close to an already completed park diminishes the supply of open land and adds residents who require park space

Another assertion by Associated is that the only exactions imposed upon subdividers which may be valid are those directly related to the health and safety of the subdivision residents and necessary to the use and habitation of the subdivision, such as sewers, streets and drainage facilities. While it is true that such improvements are categories directly required by the health and safety of subdivision residents, it cannot be said that recreational facilities are not also related to these salutary purposes. So far as we are aware, no case has held a dedication condition invalid on the ground that, unlike sewers or streets, recreational facilities are not sufficiently related to the health and welfare of subdivision residents to justify the requirement of dedication. As shall appear hereinafter, several other jurisdictions have upheld exactions similar to those imposed by section 11546 on the ground that the influx of new residents increases the need for park and recreational facilities.[7]

Associated next poses as an eventuality that, if the requirements of section 11546 are upheld as a valid exercise of the police power on the theory that new residents of the subdivision must pay the cost of park land needs engendered by their entry into the community, a city or county could also require contributions from a subdivider for such services as added costs of fire and police protection, the construction of a new city hall, or even a general contribution to defray the additional cost of all types of governmental services necessitated by the entry of the new residents.

This proposition overlooks the unique problem involved in utilization of raw land. Undeveloped land in a community is a limited resource which is difficult to conserve in a period of increased population pressure. The development of a new subdivision in and of itself has the counterproductive effect of consuming a substantial supply of this precious commodity, while at the same time increasing the need for park and recreational land. In terms of economics, subdivisions diminish supply and increase demand. Another answer to Associated's assertion is found in the provisions of section 11546 itself. As we have seen, the section requires that land dedi-

within the city as a whole. A similar rationale was employed in *Southern Pac. Co.* v. *City of Los Angeles* (1966) 242 Cal.App.2d 38 [51 Cal.Rptr. 197], to uphold an ordinance requiring dedication of property for street widening as a condition of obtaining a building permit. (See also *Bringle* v. *Board of Supervisors* (1960) 54 Cal.2d 86 [4 Cal.Rptr. 493, 351 P.2d 765]; *Jenad, Inc.* v. *Village of Scarsdale* (1966) 18 N.Y.2d 78 [271 N.Y.S.2d 955, 957-958, 218 N.E.2d 673].)

[7]The only case cited by Associated which declared a statute similar to section 11546 to be unconstitutional recognized the need for recreational facilities caused by the influx of new residents but held that the need for such facilities must be "specifically and uniquely attributable" to the subdivider's activities and that the record did not indicate that this requirement had been met. (*Pioneer Trust & S. Bank* v. *Village of Mount Prospect* (1961) 22 Ill.2d 375 [176 N.E.2d 799, 802].) We have rejected this rationale in our previous discussion.

cated or in-lieu fees are to be used for the recreational needs of the subdivision which renders the exaction. Since the increase in residents creates the need for additional park land and the land or fees are used for facilities for the new residents, although not to the exclusion of others, the circumstances may be distinguished from a more general or diffuse need created for such areawide services as fire and police protection.[8]

Associated claims that section 11546 constitutes a special burden upon the future inhabitants of the subdivision since the amount the subdivider must contribute will ultimately be reflected in the increased cost of homes to the future residents. It is asserted that a double tax will be imposed on the new residents because they must not only pay for the initial cost of the park but will also be required to assume property taxes which will be used for its development and maintenance.[9] ■ Double taxation occurs only when "two taxes of the same character are imposed on the same property, for the same purpose, by the same taxing authority within the same jurisdiction during the same taxing period." (Rhyne, Municipal Law, p. 673.) ■ Obviously the dedication or fee required of the subdivider and the property taxes paid by the later residents of the subdivision do not meet this definition. If Associated's claim were valid the prior residents of a community could also claim double taxation since their tax dollars were utilized to purchase and maintain public facilities which will be used by the newcomers who did not contribute to their acquisition.[10]

Another contention by Associated is that section 11546 arbitrarily imposes its requirements only upon subdividers whereas those who do not

[8]We do not imply that only those exactions from a subdivider are valid which present the special considerations set forth with regard to section 11546 but hold only that the exactions required by the section are justified by special factors not applicable to such matters as the increased cost of governmental services. In this connection we note that the Attorney General has filed an amicus curiae brief expressing concern that our holding regarding the validity of section 11546 may reflect upon the constitutionality of two recently enacted statutes requiring subdividers to provide public access to coastlines and to inland waters owned by a public agency. (Bus. & Prof. Code, §§ 11610.5, 11610.7.) Those sections are not involved in this proceeding and nothing we have said here is intended to reflect upon their validity.

[9]If Associated does not actually pay the exaction but merely passes the cost on to the consumer, a question arises as to its standing in this proceeding since it suffers no detriment and is not authorized to represent the consumers who it asserts will be taxed. Rather than relying upon that proposition, however, we prefer to decide the matter on the merits.

[10]A related contention is advanced that the exaction constitutes a special assessment against the future owners of property in the subdivision who have no right to a hearing or to protest. Similar arguments were rejected in *Jordan* v. *Village of Menomonee Falls* (1965) 28 Wis.2d 608 [137 N.W.2d 442, 450], and *Jenad, Inc.* v. *Village of Scarsdale, supra*, 271 N.Y.S.2d 955, 958. (But see Reps and Smith, *Control of Urban Land Subdivision* (1963) 14 Syracuse L.Rev. 405, 407 et seq.)

subdivide are free from its exactions. The example is suggested of an apartment house built on land which is not subdivided. The future occupants may live the same distance from a public park and have the same right to use the recreational facilities as the residents of a nearby subdivision, yet the builder of the apartment house is not required to contribute to park facilities because he has constructed his apartment without subdividing. This point has some arguable merit in the sense that the apartment builder, by increasing the population of an area, may add to the need for public recreational facilities to the same extent as the subdivider. However, the apartment is generally vertical, while the subdivision is horizontal. The Legislature could reasonably have assumed that an apartment house is thus ordinarily constructed upon land considerably smaller in dimension than most subdivisions and the erection of the apartment is, therefore, not decreasing the limited supply of open space to the same extent as the formation of a subdivision. This significant distinction justifies legislatively treating the builder of an apartment house who does not subdivide differently than the creator of a subdivision.

 Finally, Associated attacks the constitutionality of subdivision (f) of section 11546, which specifies that a city or county must state when development of park or recreational facilities will begin. It is claimed that the city could in one case postpone development for 10 years and in another begin development within a year, and that this discretion amounts to an arbitrary delegation of power to the local governmental body and a denial of due process and equal protection of the laws. Obviously, the need for park and recreational facilities will vary from one community to another and from one neighborhood to another within the same community. The city's resolution 2225 provides that improvements to the parks shall be made as the subdivision area develops and park facilities become necessary. Constitutional considerations do not require a more precise standard; the courts are available to redress any unreasonable delay in development.[11]

---

[11]An additional argument of Associated is that subdivision (g) is unconstitutional in that it provides only the payment of fees as opposed to dedication of land may be required for subdivisions containing 50 parcels or less. The basis of this claim appears to be that it discriminates against owners who subdivide into more than 50 parcels. It is true that the size of a parcel is not defined in section 11546 so that one subdivider may be required to dedicate land for a park because he divides his land into more than 50 parcels whereas another subdivider with the same total acreage but who subdivides into less than 50 parcels may only be required to pay a fee in lieu of dedication. However, we cannot see how this difference discriminates against the first subdivider since the value of the land taken from him and the amount of the fee exacted from the second subdivider are fixed in accordance with the same population-density formula except that the fee to be paid by a subdivider with less than 50 parcels is calculated not by the value of the land he would have been required to dedicate within his subdivision but by the value of the land in the portion of the local park required to serve the needs of the subdivision. The fact that in one case the payment

Many of the issues raised by Associated have been discussed in the cases and law reviews.[12] The clear weight of authority upholds the constitutionality of statutes similar to section 11546. While Illinois has held an ordinance requiring a subdivider to dedicate land for park purposes to be unconstitutional (*Pioneer Trust & S. Bank* v. *Village of Mount Prospect, supra,* 176 N.E.2d 799, 801-802),[13] Montana has reached a contrary conclusion (*Billings Properties, Inc.* v. *Yellowstone County* (1964) 144 Mont. 25 [394 P.2d 182]). New York and Wisconsin have affirmed the validity of statutes requiring either dedication or a fee in lieu thereof (*Jenad, Inc.* v. *Village of Scarsdale, supra,* 271 N.Y.S.2d 955; *Jordan* v. *Village of Menomonee Falls* (1965) *supra,* 137 N.W.2d 442). In Connecticut the dedication requirement has been upheld but the requirement that a fee be paid in lieu of dedication was struck down on the ground that its use was not confined for the benefit of the subdivision but to the contrary the fees could be utilized to purchase park land for the residents of the entire town (*Aunt Hack Ridge Estates, Inc.* v. *Planning Com'n* (1967) 27 Conn.Supp. 74 [230 A.2d 45, 47]).

The rationale of the cases affirming constitutionality indicate the dedication statutes are valid under the state's police power. They reason that the subdivider realizes a profit from governmental approval of a subdivision since his land is rendered more valuable by the fact of subdivision, and in return for this benefit the city may require him to dedicate a portion of his land for park purposes whenever the influx of new residents will increase the need for park and recreational facilities. (*Jordan* v. *Village of Menomonee Falls, supra,* 137 N.W.2d 442, 448; *Billings Properties, Inc.* v. *Yellowstone County, supra,* 394 P.2d 182, 187.) Such exactions have been compared to admittedly valid zoning regulations such as minimum lot

is made in land whereas in another it is made in money does not appear to be significant or discriminatory.

[12]See, e.g., Zilavy, *Comment, supra,* 1961 Wis.L.Rev. 310; Cutler, *Controlling Community Growth,* 1961 Wis.L.Rev. 370, 387-391; Johnston, *Subdivision Control Exactions,* 52 Cornell L.Q. 871; Heyman and Gilhool, *Increased Community Costs,* 73 Yale L.J. 1121; Reps and Smith, *Control of Urban Land Subdivision, supra,* 14 Syracuse L.Rev. 405; Cunningham, *Subdivision Control,* 66 Mich.L.Rev. 1, 28; Taylor, *Subdivision Control,* 13 Hastings L.J. 344, 350.

[13]*Pioneer Trust* relied upon *Ayres,* interpreting it as holding that a developer may be compelled to provide the streets which are required by the activity within the subdivision but cannot be required to provide a major thoroughfare, the need for which stems from the total activity of the community. The court in *Pioneer Trust* goes on to state that in the light of this principle a dedication requirement may be upheld only if the burden cast upon the subdivider is specifically and uniquely attributable to his activity and that no such showing was made. The *Ayres* case cannot be interpreted in this manner. One commentator has written that *Pioneer Trust* completely misunderstood the holding of *Ayres.* (See Johnston, *Subdivision Control Exactions, supra,* 52 Cornell L.Q. 871, 907-908.)

size and setback requirements. (*Jenad, Inc.* v. *Village of Scarsdale, supra,* 271 N.Y.S.2d 955, 958.)

### Constitutionality of Section 10-1.516 of the Walnut Creek Municipal Code

Turning from the state statute to the Municipal Code, Associated argues that the fees the subdivider must pay in lieu of dedicating land are, under the city's ordinance, determined arbitrarily and without a reasonable relationship to principles of equality. It is claimed, for example, that a subdivider who develops high-density land may be required to pay a higher fee in lieu of dedication than one who develops low-density land even though both builders may be responsible for bringing the same number of new residents into the community. This may be true because the higher-density land is frequently more valuable and the fee is measured by the amount of land required by the number of persons in the subdivision.[14]

While the owner of more valuable land which will support a greater number of living units may be required to pay a higher fee for each new resident than the owner of less valuable land with a lower density, it does not follow that there is no reasonable relationship between the use of the facilities by future residents and the fee charged by the subdivider. It is a proper assumption that persons occupying housing in a high-density area will use the public recreational facilities more consistently than those residents in single family homes who have private yards and more open space readily at their individual disposal.

Another series of contentions made by Associated relates to assertedly indefinite and arbitrary standards and procedures set forth in the ordinance. It is urged (1) that the concept of fair market value is too indefinite and that a subdivider would hesitate to incur the delay and expense of testing value in the courts, and (2) that the city has absolute discretion to determine that the dedication of land is not feasible and that a fee should be charged in lieu thereof. These contentions are without merit. The question of fair market value is litigated frequently in the courts and no authority cited requires a more precise definition. A subdivider need not delay his development because of a dispute over this issue. Nor can it be said, for the reasons pointed

---

[14]Associated poses as an example a subdivider who owns 25 acres of land valued at $20,000 an acre, who divides his land into 100 lots for single family residences and one who owns 50 acres worth $10,000 each, which he divides into 100 lots, two to an acre. The city assumes four occupants to each single family home. Each subdivider brings 400 persons into the community and each must contribute one acre or its cash equivalent for park purposes under the city's formula. Therefore, the first subdivider contributes $20,000 while the second is required to contribute only $10,000 although both increase the community's population by the same number of new residents.

out in the margin below, that there are insufficient criteria for determining when a fee should be required in lieu of dedication.[15]

The ordinance and resolution also provide that if the subdivider designates open space for recreational areas and facilities, this reduces the demand for local recreational needs and if the subdivider gives guarantees that the land will be permanently maintained for such use the city may give credit to the subdivider, reducing the exactions required of him. Associated complains that this provision may result in unequal treatment of subdividers in that there are no reasonable standards for determining when the city will afford credit to one subdivider and deny it to another.

We note that section 11546 contains no requirement that a city reduce the dedication of fee requirement in the event that a subdivider has voluntarily provided recreational areas. There is a sound basis for such omission. The Legislature has expressed a policy of encouraging cities and counties to adopt long-range master plans for the recreational needs of the community. Such a plan takes into account the overall requirements of the city's residents, present and future, including the local needs of subdivision residents. If a legislative body were required to give credit for private recreational areas furnished by a subdivider in his proposed subdivision, the viability of the master plan would be destroyed and the subdivider would be substituted for the city as the arbiter of the community's park needs. It is just this type of haphazard response to the community's recreational requirements that subdivision (d) of section 11546 was intended to allay.

While the city is not required to give credit for recreational facilities contributed by the subdivider, if it chooses to do so it must be given broad discretion to assure that the proposed facilities are in keeping with the master plan. Section 10-1.516, which provides that credit shall be given if the facilities designated by the subdivider "satisfy the . . . principles and standards" in the master plan, sets forth a sufficiently defined standard.

The parties are in disagreement as to whether fees in lieu of dedication may be used only for the purchase of land or whether they may also be employed under the provisions of section 11546 to improve land already owned by the city which serves the needs of the subdivision.[16] Section

---

[15]Resolution 2225 provides that land dedication will be required if park land designated on the master plan is incorporated within the subdivision and if the slope, topography and geology of the site as well as its surroundings are suitable for the intended use of the park. However, if dedication is impossible, impractical, or undesirable, a fee will be required. The impracticality of dedication occurs whenever the physical characteristics of the land or its surroundings render the land within the subdivision unsuitable for park or recreational purposes.

[16]The parties have stipulated that if a subdivision is located within three-fourths of a mile from elementary school grounds or a neighborhood or community park,

11546 provides that the fees may be used for "park or recreational purposes" or "park and recreational facilities."

The word "purposes" may be somewhat broader than "facilities" but we must look to the underlying object of the legislation in interpreting its scope. It is clear from what has been said above that the Legislature was concerned largely with the maintenance of open space for recreational use. ▆ We conclude that it is consistent with this purpose for fees to be utilized either for the purchase of park or recreational land or, if the city deems that there is sufficient land available for the subdivision's use, for improvement of the land itself as, for example, for drainage or landscaping,[17] but not for purposes unrelated to the acquisition and improvement of land.

### The City's Ordinances and Resolutions Comply with Section 11546

On this topic a few additional matters require brief elaboration. Associated argues that the city has enacted no definite principles for park and recreational facilities, as required by subdivision (d) of section 11546. The city's general plan indicates the location of various types of parks and recreational facilities and there is a sufficiently detailed set of principles and standards for the development of these facilities to satisfy the requirements of the section.[18]

▆ Associated complains that although subdivision (b) of section 11546 requires that a city's *ordinance* set forth the standard for determining the amount of land to be dedicated or fee to be paid by a subdivider,

---

the city uses the fees provided by the subdivider for improving such recreation areas rather than for the purchase of additional park land. The children in the school as well as other residents of the area use such facilities. In the city's principles and standards for park land it is declared that park facilities and school sites can be more efficiently built and operated when several facilities are grouped and that a neighborhood park should be integrated with an elementary school to provide space for indoor and outdoor activities. Neighborhood parks should contain a neighborhood center building, park area, playground, etc., and the design should be balanced to meet the needs of the school and the neighborhood.

[17]Associated makes the untenable argument that because the Legislature failed to adopt a proposed amendment to section 11511 of the Business and Professions Code, it manifested its intention to permit the use of in-lieu fees only for purchase of land. Proposed model legislation, which was not adopted, provided that the fee in lieu of dedication could be used in the purchase and improvement of park and open space facilities and the amendment of section 11511 merely defined improvement as including work to be done by the subdivider on land which he had dedicated.

[18]The standards set forth various general principles under which park and recreation land is acquired and developed, the amount of park land required for the city's population and for different types of parks, the minimum areas therein, and the various facilities which each type of park should contain.

ordinance 10-1.516 contains no such standard. It provides instead that the standards shall be set forth by resolution; it is resolution 2225 rather than the ordinance which specifies these matters. There is no showing in the record as to the circumstances under which the resolution was adopted.

It has been held that even where a statute requires the municipality to act by ordinance if a resolution is passed in the manner and with the statutory formality required in the enactment of an ordinance, it will be binding and effective as an ordinance. (*Central Manufacturing District, Inc.* v. *Board of Supervisors* (1960) 176 Cal.App.2d 850, 860 [1 Cal.Rptr. 733].) Since there is no showing in the record as to the circumstances under which the resolution was adopted, we presume its validity.

It may come to pass, as Associated states, that subdividers will transfer the cost of the land dedicated or the in-lieu fee to the consumers who ultimately purchase homes in the subdivision, thereby to some extent increasing the price of houses to newcomers. While we recognize the ominous possibility that the contributions required by a city can be deliberately set unreasonably high in order to prevent the influx of economically depressed persons into the community, a circumstance which would present serious social and legal problems, there is nothing to indicate that the enactments of Walnut Creek in the present case raise such a spectre. The desirability of encouraging subdividers to build low-cost housing cannot be denied and unreasonable exactions could defeat this object, but these considerations must be balanced against the phenomenon of the appallingly rapid disappearance of open areas in and around our cities. We believe section 11546 constitutes a valiant attempt to solve this urgent problem, and we cannot say that its provisions or the city's enactments pursuant to the section are constitutionally deficient.

The judgment is affirmed.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.