[No. A050092. First Dist., Div. Three. Oct. 28, 1991.]

SACRAMENTO MUNICIPAL UTILITY DISTRICT, Plaintiff and Respondent, v.
COUNTY OF SONOMA, Defendant and Appellant.

### COUNSEL

James P. Botz, County Counsel, Rosemary H. Morgan, Chief Deputy County Counsel, Howard, Rice, Nemerovski, Canady, Robertson & Falk and Steven L. Mayer for Defendant and Appellant.

Morrison & Foerster, Kathy J. Bagdonas and Frank A. McGuire for Plaintiff and Respondent.

Daniel E. Lungren, Attorney General, and Julian O. Standen, Deputy Attorney General, as Amici Curiae on behalf of Plaintiff and Respondent.

### OPINION

**CHIN, J.**—The County of Sonoma (the County) appeals from a judgment invalidating its tax on public entities that generate electricity from geothermal steam in the County. It contends that the constitutional exemption from property taxes for public property does not prohibit a tax on the use of public property. The Sacramento Municipal Utility District (SMUD) contends that the narrowly drawn tax attempts to do indirectly what cannot be done directly—impose a property tax on SMUD.

The tax was expressly designed to apply only to entities exempt from property taxes and thereby reduce the loss of property tax revenue from public entities. As an obvious substitute for the proscribed property tax, the County's tax precisely frustrates the California Constitution's grant of a property tax exemption to public property. Therefore, we affirm this aspect of the judgment.

The County also challenges the trial court's award of prejudgment interest to SMUD at the rate of 10 percent. The County contends that the interest rate on any refund to SMUD should be 7 percent. We agree that the 10 percent rate was incorrect. However, the proper rate of interest is the 9 percent rate provided by Revenue and Taxation Code section 5150. Therefore, we modify the judgment.

## FACTS

The trial court decided the case by a summary judgment based on facts that neither party disputed. Our review of that decision therefore begins with those undisputed facts.

SMUD is a municipal utility district established under Public Utilities Code section 11501 et seq. SMUD owns and operates a variety of facilities for generating electricity, which it supplies to customers in Sacramento County and a portion of Placer County.

In 1981, the California Energy Commission approved SMUD's plans for a power plant in the Geysers region of Sonoma County. The power plant was to generate electricity from geothermal steam, as did a number of plants already operated at the Geysers by Pacific Gas and Electric Company (PG&E). SMUD's plant began operating on December 1, 1983. SMUD leased the land for the plant from the United States government. The power plant did not replace any improvements to the land that were subject to property taxes. Under article XIII, section 3, of the California Constitution, SMUD's plant is exempt from property taxes.

In August 1980, the County board of supervisors (the Board) passed a resolution calling for a special election on an ordinance to tax both the extraction of geothermal steam and the generation of electricity from geothermal steam in the County. At the public hearing on the proposed ordinance, PG&E objected to the tax. PG&E said the tax would result in a rate increase for its customers in the County and proposed that property-taxpaying entities should be exempt from the tax. County residents objected to taxing geothermal steam extraction, contending that the tax would reduce

their royalties from steam sales. The Board stated that the intent of the ordinance was to tax entities exempt from the property tax. The Board withdrew the proposed ordinance from the November 1980 ballot.

In June 1981, the Board considered a revised proposal to tax generation of electricity from geothermal steam. The new ordinance specifically exempted entities, such as PG&E, that paid property taxes. The county counsel's summary report on the proposal noted that several public agencies were in the process of considering or developing facilities to generate electricity from geothermal steam. The report went on to state: "Because these entities enjoy a property tax exemption the County and its cities and districts stand to lose approximately $1,900,000 in property taxes. [¶] This proposal serves to cut that revenue loss by imposing a special tax pursuant to Proposition 13. [¶] . . . The proposed tax measure would . . . [¶] . . . earmark the proceeds of the tax: half for property tax reduction and half for roads and public safety . . . ."

The Board passed a resolution calling for the voters to decide the following question in the November 1981 elections: "Shall the People of Sonoma County adopt Ordinance No. 2853R imposing a special tax on the generation of electricity from geothermal resources, raising the appropriation limit of the County of Sonoma, and designating the expenditure of the proceeds of the tax for property tax reduction, roads, and public safety?" Ordinance No. 2853R (hereafter ordinance) imposed a tax on "every person exercising the privilege of generating electricity from geothermal resources extracted in Sonoma County." The tax rate was not to exceed 6 percent of the gross market value of the electricity generated from geothermal resources within the County.

Section 12-56 of the ordinance contained the following exemption: "The tax imposed by section 12-51 shall not apply to any person obligated by the provisions of Article XIII of the California Constitution to pay annual property taxes on improvements directly utilized by such person in the exercise of the privilege of generating electricity from geothermal resources within Sonoma County. [¶] The exemption provided by this section shall not apply to any person who, pursuant to the provisions of Article XIII of the California Constitution, is exempt from property taxation of any improvement directly utilized by such person in the exercise of the privilege of generating electricity from geothermal resources within Sonoma County."

Section 3 of the ordinance stated: "The People of Sonoma County, in adopting this ordinance, find that it is necessary to increase revenues for the financing of county government in the areas of law enforcement, fire

protection, road maintenance, and road construction; and further that additional revenues are necessary to provide a reduction in property taxes in order to equalize the burden of taxation. It is further found that the exemption provided in section 12-56 is necessary to prevent an unreasonable double taxation and to avoid compensating electric rate increases in Sonoma County by the California Public Utilities Commission."

The Board submitted an argument in favor of the ordinance for inclusion in the materials sent to the voters for the November 1981 elections. The argument stated, in part: "The Board of Supervisors proposes to reduce property taxes by direct refund or credit on annual tax bills. Approximately 50% of the revenues collected will be used for property tax relief. The remaining 50% of the revenues collected will be allocated to road improvements and public safety (police and fire) as determined by the Board of Supervisors. [¶] The purpose of this measure is to prevent certain foreign municipalities (public agencies outside Sonoma County) who are developing this depletable resource of Sonoma County, and are exempt from property taxes, from generating electricity without paying their fair share of the impacts caused by this development." The impartial analysis by county counsel, included in the materials sent to the voters, stated: "The purpose of this special tax is to tax the production of electrical energy from geothermal resources within Sonoma County by persons who are exempt from paying local county property taxes. . . . [¶] The tax would apply to any person who generates electrical energy from geothermal resources within Sonoma County who is not obligated under the California Constitution to pay annual property taxes on the improvements directly utilized in generating the electricity."

The ordinance received approval from more than two-thirds of the County's voters in the November 1981 election. In March 1983, the Board set the tax rate at the maximum allowable under the ordinance, 6 percent; the rate was reduced to 2 percent in December 1987. Through June 1988, SMUD paid a total of $8,789,940 under the tax.

## DISCUSSION

The trial court based its decision to invalidate the tax on three grounds: (1) the tax conflicts with SMUD's constitutional exemption from property taxes; (2) the tax was not imposed on the voters of the County, as required by Proposition 13 under *California Bldg. Industry Assn.* v. *Governing Bd.* (1988) 206 Cal.App.3d 212, 237-239 [253 Cal.Rptr. 497]; and (3) the County lacked legislative authority to tax a public entity to raise revenue for police or fire protection services. The decision of the trial court must be affirmed if correct

on any basis. (*United Pacific Ins. Co.* v. *Hanover Ins. Co.* (1990) 217 Cal.App.3d 925, 933-934, fn. 9 [266 Cal.Rptr. 231] and accompanying text.) That we discuss only one of the trial court's bases should not be interpreted as an implicit comment on the merits of the others; we simply find it unnecessary to address them.

### The Tax Conflicts With the Constitution's Property Tax Exemption for Public Property

The California Constitution provides that property owned by the state and property owned by a local government are exempt from property taxation. (Cal. Const., art. XIII, § 3, subds. (a) and (b).) Provisions exempting private property from taxation are strictly construed; such exemptions cannot be enlarged or extended beyond the plain meaning of the language used. (*San Francisco* v. *San Mateo* (1941) 17 Cal.2d 814, 817 [112 P.2d 595].) However, this rule does not apply to the exemption from taxation for public property. The exemption for public property is liberally construed because taxing such property is the exception rather than the rule; public property is taxed only if there is express authority to do so. (*Ibid.*; *The Housing Authority* v. *Dockweiler* (1939) 14 Cal.2d 437, 454 [94 P.2d 794]; *Pasadena* v. *County of Los Angeles* (1920) 182 Cal. 171, 174 [187 P. 418].)

The reasoning behind the exemption is that when a municipal corporation or public agency of the state owns real property used for the purposes of such agency, the ultimate title is in the state itself. "[T]o countenance taxation of such property would be to countenance the folly of the sovereign taxing its own property 'and taking money out of one pocket to put in another.'" (*Smith* v. *City of Santa Monica* (1912) 162 Cal. 221, 222 [121 P. 920]; see also *San Marcos Water Dist.* v. *San Marcos Unified School Dist.* (1986) 42 Cal.3d 154, 161 [228 Cal.Rptr. 47, 720 P.2d 935]; *Eisley* v. *Mohan* (1948) 31 Cal.2d 637, 642 [192 P.2d 5].) Public ownership alone confers the exemption; the exemption is not conditioned on use of the property exclusively for governmental purposes. (*Anderson-Cottonwood I. Dist.* v. *Klukkert* (1939) 13 Cal.2d 191, 196, 199 [88 P.2d 685]; *English* v. *County of Alameda* (1977) 70 Cal.App.3d 226, 238 [138 Cal.Rptr. 634].)

The County's tax on a use of public property collides with these principles. The County is a political subdivision of state government, exercising only the powers of the state granted by the state, and holding all its property as agent of the state. (*County of Marin* v. *Superior Court* (1960) 53 Cal.2d 633, 638-639 [2 Cal.Rptr. 758, 349 P.2d 526].) Similarly, SMUD is a political subdivision of the state. (*Sacramento etc. Dist.* v. *Pac. G. & E. Co.*

(1946) 72 Cal.App.2d 638, 653 [165 P.2d 741].) SMUD's activities in providing the utilities of light, heat, and power are governmental, or at least quasi-governmental, functions. (*City of Pasadena* v. *Chamberlain* (1928) 204 Cal. 653, 663 [269 P. 630]; *Grason Elec.* v. *Sacramento Mun. Utility Dist.* (9th Cir. 1985) 770 F.2d 833, 838; *Pacific Gas & Electric Co.* v. *Sacramento M. Utility Dist.* (9th Cir. 1937) 92 F.2d 365, 373, cert. den. (1938) 303 U.S. 640 [82 L.Ed. 1100, 58 S.Ct. 610].)

The County contends that the constitutional exemption from property taxes does not apply to its tax on generating electricity from geothermal steam. The ordinance imposing the tax designates it as a tax on "every person exercising the privilege of generating electricity from geothermal resources extracted in Sonoma County." The County argues that the tax plainly is an excise tax, imposed not on the ownership of property but on the privilege of exercising one of the incidences of ownership. (See *City of Oakland* v. *Digre* (1988) 205 Cal.App.3d 99, 106 [252 Cal.Rptr. 99].) From this premise, the County concludes that the property tax exemption is inapplicable because an excise tax on a privilege is not a property tax within the meaning of the constitutional exemption. (See *Brunton* v. *Superior Court* (1942) 20 Cal.2d 202, 206-207 [124 P.2d 831].)

█ "The character of a tax must be determined by its incidents, and from the natural and legal effect of the language employed in the act. [Citations.]" (*Flynn* v. *San Francisco* (1941) 18 Cal.2d 210, 214 [115 P.2d 3].) The nomenclature is of minor importance, for the courts must look beyond the mere title or the bare legislative assertion of the tax's designation and determine the real object, purpose, and result of the enactment. (*Id.*, at pp. 214-215; *City of Oakland* v. *Digre, supra,* 205 Cal.App.3d at p. 105.)

█ Taken together, three aspects of the County's tax strongly demonstrate that for all practical purposes and intents, the County's tax is an impermissible substitute for a property tax on publicly owned property. First, despite the ordinance's ostensible applicability to "every person exercising the privilege of generating electricity . . . ," the ownership of the property used to generate electricity is the critical factor for imposing the tax. The "exemption" provided in the County's ordinance effectively determines liability for the tax based solely on who owns the property. Under the ordinance, only an owner of property exempted from property taxation by article XIII of the Constitution will be taxed, and the only owners of such property that use it to generate electricity are public entities. The only entities subjected to this tax are arms of the state or local governments exempted from property taxes. (See Cal. Const., art. XIII, § 3.)

Second, the exemption for entities that pay property taxes is further evidence that the County's tax is the equivalent of a property tax. Section 3 of the ordinance states that the exemption for those obligated to pay property taxes "is necessary to prevent an unreasonable double taxation . . . ." However, "[d]ouble taxation occurs only when 'two taxes of the same character are imposed on the same property, for the same purpose, by the same taxing authority within the same jurisdiction during the same taxing period.' [Citation.]" (*Associated Home Builders etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633, 642 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847]; *Russ Bldg. Partnership* v. *City and County of San Francisco* (1987) 199 Cal.App.3d 1496, 1509 [246 Cal.Rptr. 21].) The finding by the voters that property taxation and the electricity generation tax posed the threat of "unreasonable double taxation" belies any contention that the two taxes share nothing in their objects, purposes, and results.

Third, the County's ordinance calls for uses of the tax's revenues that are linked to property tax relief and governmental activities historically funded by property tax revenues. Section 2 of the ordinance provides: "The appropriations limit of the County of Sonoma is increased for each year by an amount equal to fifty percent of the revenue produced in that year by the taxes imposed . . . . The remainder of the revenue annually produced . . . shall be used to reduce the annual property tax allocation to the County of Sonoma pursuant to Section 2 of Article XIIIB of the California Constitution. . . ." The ordinance states that the revenue generated by the tax would be "appropriated by the Board of Supervisors for public safety and roads . . . ." (Ord. § 12-58.) Moreover, in adopting the ordinance, the voters found "that it is necessary to increase revenues for the financing of county government in the areas of law enforcement, fire protection, road maintenance, and road construction; and further that additional revenues are necessary to provide a reduction in property taxes in order to equalize the burden of taxation." (Ord., § 3.) The county counsel's report to the Board further emphasized the tax's link with property taxes by stating that the tax "serves to cut [the property tax] revenue loss" resulting from the public entities' property tax exemption.

Our conclusion that the County's tax conflicts with the constitutional exemption follows from two decisions: *San Marcos Water Dist.* v. *San Marcos Unified School Dist., supra,* 42 Cal.3d 154, and *John Tennant Memorial Homes, Inc.* v. *City of Pacific Grove* (1972) 27 Cal.App.3d 372 [103 Cal.Rptr. 215]. In *San Marcos,* the Supreme Court held that the school district was exempt from " 'sewer capacity right fees' " imposed by the water district. (*San Marcos, supra,* 42 Cal.3d at pp. 157-158.) The court found that the fees, although possessing characteristics of user charges that can be

imposed on public entities, were in effect special assessments from which public entities are exempt. (*Id.*, at pp. 164-165.) The court endorsed a pragmatic test developed in the Courts of Appeal: "By placing the emphasis on the *purpose* of the charge, the courts in those cases created a rule which both conforms to the policy behind the implied exemption for public entities, and avoids easy manipulation. A contrary ruling would, in effect, abrogate the public entities' implied exemption from assessments by sewer districts. Under the rule we adopt, no matter how the *form* of the fee is varied . . . , the *purpose* of the fee will determine whether or not public entities are exempt from paying the fee." (*Id.*, at p. 164, original italics.)

The *San Marcos* court found that the fees in that case contravened the implied exemption for public entities from special assessments because the fees were aimed at defraying costs of capital improvements, which is the purpose of special assessments. (*San Marcos Water Dist.* v. *San Marcos Unified School Dist., supra,* 42 Cal.3d at pp. 161, 164-165.) The County contends the rule has no applicability outside the context of fees and special assessments, which are legally distinct from property taxes and excise taxes. The County argues that examining the purpose of a fee can be appropriate because the defining characteristic of a special assessment is the use to which the revenue is put. By contrast, property and excise taxes are distinguished by what is taxed: ownership per se for property taxes, and one of the incidences of ownership, such as use of property, for excise taxes. Thus, the County concludes that focusing on the purpose of its tax should not determine whether the tax is barred by the property tax exemption. We disagree.

*San Marcos* does not exclude excise taxes from the rule it endorsed. Indeed, the Court of Appeal decision reversed by *San Marcos* relied in part on a Supreme Court opinion that held a capital improvements charge " 'does not constitute an assessment on the value of property . . . but rather is in the nature of an excise tax . . . .' [Citation.]" (*San Marcos Water Dist.* v. *San Marcos Unified School Dist., supra,* 42 Cal.3d at p. 160, quoting *Associated Homebuilders* v. *City of Livermore* (1961) 56 Cal.2d 847, 852 [17 Cal.Rptr. 5, 366 P.2d 448].) Further, *San Marcos* noted that "charging users rather than property owners is a factor as easily manipulated as is the method of computing the fee." (*San Marcos, supra,* at p. 164.) If the purpose, and not the form, of an exaction determines whether the implied exemption derived from the property tax exemption applies, then logically the same should be true for determining whether the public property tax exemption itself applies.

The County's tax bears the outward form of an excise tax. As we discussed above, though, the purpose of the tax plainly is to substitute for the

property tax that cannot be imposed on public entities. The tax was created to reduce the loss of revenues resulting from public property's exemption from property taxation. Further, although the tax ostensibly is imposed on a use of property, the tax's incidence actually is determined by whether the property used is owned by a public entity.

In *John Tennant Memorial Homes, Inc.* v. *City of Pacific Grove, supra,* 27 Cal.App.3d 372, the city had imposed a tax on annual payments made by occupants of retirement homes that were exempt from property taxes under the state welfare exemption. (*Id.,* at p. 377.) The city's ordinance imposed the tax on the " 'privilege' " of occupying the tax-exempt retirement homes, and the court considered it to be an excise tax. (*Id.,* at p. 384.) Nevertheless, the court held the ordinance was void as inconsistent with paramount state law: "The tax imposed by the ordinance here is expressly designed to and applies only to persons who are beneficiaries of the welfare exemption. The ordinance attempts to recover for the City the amount of tax money that has been lost because of the retirement home tax exempt status. Thus, the purpose of the ordinance exactly and precisely nullifies and frustrates the state welfare exemption . . . ." (*Id.,* at p. 385.)

The County contends that its tax does not frustrate the purpose of the public property exemption. The County bases this argument on a statement in *San Marcos*: "The rationale behind a public entity's exemption from property taxes and special assessments is to prevent one tax-supported entity from siphoning tax money from another such entity; the end result of such a process could be unnecessary administrative costs and no actual gain in tax revenues. [Citation.]" (*San Marcos Water Dist.* v. *San Marcos Unified School Dist., supra,* 42 Cal.3d at p. 161.) Because SMUD operates on enterprise funds and not tax revenues, the County argues that its tax on SMUD cannot conflict with the constitutional property tax exemption.

The County's argument is flawed in several respects. We do not read *San Marcos* as holding that the public property exemption applies only when one tax-supported entity attempts to tax another, nor does the constitutional exemption contain such a limitation. ▆▆▆ *San Marcos* itself put forward an additional reason for the exemption: "Public entities are exempt from property taxes and special assessments in order to preserve the balance in funding established by the Legislature and to avoid unnecessary administrative costs. [Citation.]" (*San Marcos Water Dist.* v. *San Marcos Unified School Dist., supra,* 42 Cal.3d at p. 167.) Moreover, SMUD has long had "the power to increase its revenues to meet any increase in costs by an increase in its rates (Pub. Util. Code, § 12809) *or by a levy of taxes* (Pub. Util. Code, § 12892)." (*Sacramento Municipal Util. Dist.* v. *Spink* (1956) 145 Cal.App.2d

568, 580 [303 P.2d 46], italics added; see *Pacific Gas & Electric Co.* v. *Sacramento M. Utility Dist., supra,* 92 F.2d at p. 373 [SMUD "duly empowered to finance the public function of supplying its inhabitants with light, heat, and power through general taxation . . ."].) Even if SMUD does not presently exercise its power to tax, that is not a critical distinction when one political subdivision of the state taxes another's use of property solely because the property is publicly owned.

█ Our conclusion does not mean that public entities' property tax exemption produces a blanket exemption from excise taxes. However, the County's tax is not a simple or permissible excise tax. The incidence of the tax depends as much on who owns the property as on how the property is used. The tax was carefully and explicitly designed to affect only public entities entitled to the constitutional property tax exemption. The tax was specifically intended to recover from public entities the tax revenues lost because of the property tax exemption. The tax plainly substitutes for a property tax, from which public entities are constitutionally exempt. As such, the County's tax exactly and precisely nullifies the property tax exemption of the Constitution, article XIII, section 3, subdivisions (a) and (b).

*Revenue and Taxation Code Section 5150 Establishes the Proper Prejudgment Interest Rate at 9 Percent*

█ The trial court awarded SMUD prejudgment interest at the rate of 10 percent. The County contends the interest rate should be 7 percent, if any refund is due at all. Neither rate is correct.

Article XIII, section 32, of the Constitution provides in part: ". . . After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature." The rule in California requires a specific statutory provision to create governmental liability for interest. (*Ball* v. *County of Los Angeles* (1978) 82 Cal.App.3d 312, 317 [147 Cal.Rptr. 252].)

The County and SMUD both argue that Civil Code section 3287, subdivision (a), is the proper basis for any interest award, though that section does not specify a rate of prejudgment interest. The County argues that 7 percent is the legal rate for prejudgment interest, based on cases relying on article XV, section 1, of the Constitution.[1] (E.g., *May Dept. Stores Co.* v. *City of Los*

---

[1] Article XV, section 1, of the Constitution states, in pertinent part: ". . . The rate of interest upon a judgment rendered in any court of this state shall be set by the Legislature at not more than 10 percent per annum. . . . [¶] In the absence of the setting of such rate by the

*Angeles* (1988) 204 Cal.App.3d 1368, 1378 [251 Cal.Rptr. 873].) SMUD argues that 10 percent is the legal rate, based on cases addressing compensation in condemnation actions. (E.g., *Redevelopment Agency* v. *Gilmore* (1985) 38 Cal.3d 790, 794-795, fn. 2 [214 Cal.Rptr. 904, 700 P.2d 794] and accompanying text.)

We need not address whether 7 percent or 10 percent is the interest rate applicable under Civil Code section 3287 because we do not believe that resort to that section is necessary. The County's tax is invalid, and the refund to SMUD is required, because the tax substituted for a property tax and conflicted with the property tax exemption afforded to publicly owned property. Therefore, the logical interest rate to apply to the refund is the rate specified by the Legislature for property tax refunds.

Revenue and Taxation Code section 5150 provides the Legislature's decision on the interest rate applicable to property tax refunds obtained through court action: "In an action in which the recovery of taxes is allowed by the court, the plaintiff is entitled to interest on the taxes for which recovery is allowed . . . from the date of filing of the claim for refund, but in no event earlier than the date of payment of the tax or installments thereof sought to be refunded, to the date of entry of judgment, and such accrued interest shall be included in the judgment. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . .

"For taxes which become due and payable on and after March 1, 1981, the rate of interest allowed pursuant to this section shall be 9 percent per annum."

Accordingly, the judgment of the trial court must be modified to reflect the provisions of Revenue and Taxation Code section 5150. The record on appeal does not provide a basis for us to calculate the amount of interest due SMUD. We therefore will remand the matter to the trial court for a determination of the amount of interest due SMUD through the date of the trial court's judgment on June 14, 1990.

### DISPOSITION

The judgment of the trial court is affirmed in all respects, except for the following modification. Interest on the amounts paid by SMUD pursuant to

Legislature, the rate of interest on any judgment rendered in any court of the state shall be 7 percent per annum." The Legislature set the interest rate for judgments in Code of Civil Procedure section 685.010, subdivision (a): "(a) Interest accrues at the rate of 10 percent per annum on the principal amount of a money judgment remaining unsatisfied."

the County's Ordinance No. 2853R shall be calculated at the rate of 9 percent per annum from the date or dates that SMUD filed claims for refunds, but in no event earlier than the dates SMUD made the tax payments, to the date of the entry of judgment, June 14, 1990. Each party shall bear its own costs on appeal.

Merrill, Acting P. J., and Strankman, J., concurred.